STROOCK PLUSH CO. v. TALCOTT.

(Supreme Court, Appellate Division, Second Department. April 26, 1912.)

1. REFERENCE (§ 58*)—REFEREES—PLEADINGS AND AMENDMENTS.

Where, in an action for breach of contract, the complaint relied on a letter written by defendant to plaintiff containing an offer, and plaintiff's reply containing an acceptance, and the evidence showed that plaintiff's reply was never received and that the parties had orally agreed on a contract, the referee had power to allow an amendment to the complaint to correspond to the proof.

[Ed. Note.—For other cases, see Reference, Cent. Dig. §§ 89, 90; Dec. Dig. § 58.*]

2. CONTRACTS (§ 28*)—EVIDENCE OF ACCEPTANCE—LETTERS.

Where oral testimony established a contract by proving that defendant's offer was orally accepted by plaintiff, a letter written by plaintiff but never received by defendant was admissible to corroborate the proof of oral acceptance.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 133–140, 1755, 1782–1784, 1785½, 1820, 1821; Dec. Dig. § 28.*]

3. SALES (§ 52*)—CONTRACTS—EVIDENCE.

Defendant by letter offered to purchase goods to be manufactured by plaintiff. Plaintiff accepted by letter, which was never received by defendant. A witness testified to an oral acceptance by plaintiff and the execution of a written instrument satisfactory to both parties as evidencing the contract. Subsequent correspondence between the parties showed the existence of a contract, and part performance thereof by both parties. Held, that the offer of defendant was accepted and a contract made.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 118–144, 1045; Dec. Dig. § 52.*]

4. SALES (§ 272*)—CONTRACTS—IMPLIED WARRANTY.

Where a manufacturer, who is solicited to make a definite fabric for a buyer, makes a product corresponding to the article desired, the risk of the usefulness and unmarketability of the product is on the buyer,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and the manufacturer does not impliedly warrant that the product is useful for the purpose desired or marketable.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 747; Dec. Dig. § 272.*]

5. SALES (§ 188*)—CONTRACTS—DISCOUNT.

Where a contract of sale stipulated for a specified discount on the buyer paying the price on a specified date of each month during the life of the contract for deliveries made the preceding month, the buyer, refusing goods when tendered, was not entitled to a discount in determining the measure of damages.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 500–503; Dec. Dig. § 188.*]

6. SALES (§ 82*)—CONTRACTS—DISCOUNT.

Where the buyer in a contract stipulating for "settlement on the 10th of each month for deliveries during the preceding month, less 7 per cent. cash discount," did not make payments on that date, a cause of action for nonpayment arose.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 229–233; Dec. Dig. § 82.*]

7. SALES (§ 384*)—MEASURE OF DAMAGES—BREACH OF CONTRACT.

Where a buyer of the product of a manufacturer from June 13th to October 1st notified the manufacturer on July 27th that he would receive no more goods, but the manufacturer tendered all goods finished under the contract, including goods in course of manufacture on July 27th, and was allowed as damages full payment for all goods delivered or tendered, the damages based on loss of profits must be limited to the loss of profits on goods which could have been manufactured under the contract after completing the goods in course of manufacture on July 27th.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1098–1107; Dec. Dig. § 384.*]

8. SALES (§ 131*)—CONTRACTS—RIGHTS OF SELLER.

Where a manufacturer contracting to sell his entire product made between June 13th and October 1st, following, received notice from the buyer on July 27th that no more goods would be received under the contract, the manufacturer could finish the goods in course of manufacture on July 27th and recover therefor.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 325–327; Dec. Dig. § 131.*]

Appeal from Trial Term, Orange County.

Action by the Stroock Plush Company against James Talcott. From a judgment for plaintiff and from an order granting an extra allowance to plaintiff, defendant appeals.   Modified and affirmed.

Argued before JENKS, P. J., and THOMAS, CARR, WOODWARD, and RICH, JJ.

Arthur C. Rounds, of New York City, for appellant.

Benjamin N. Cardozo (M. J. Stroock, on the brief), both of New York City, for respondent.

THOMAS, J.   The plaintiff has recovered damages for defendant's breach of a contract for the purchase by him of all the embossed plushes made between June 13 and October 1, 1907.   The defendant accepted some goods, made payments thereon, but finally, after protesting their quality, refused further deliveries of similar goods, as well as payment for past deliveries, and demanded deliveries in ac-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cordance with contract. But in this action the defendant alleges: (1) That there was no contract; (2) that there was a contract, and plaintiff did not fulfill it.

[1] The defendant bases his contention of no contract made upon the fact that he made an offer by letter of June 13, 1907, and that a letter on June 15th written by plaintiff was not such unconditional acceptance of defendant's proposal as to complete the contract. But plaintiff's letter of June 15th although written by plaintiff and supposed by it to be sent, was never sent, nor did defendant, either in his partial fulfillment of a contract or in refusing to accept and to pay for the goods plaintiff sent and offered to send, know the contents of the letter or place any reliance thereon. As concerns the defendant, the letter was as to all the transactions, as if it had not been written. And yet to the plaintiff its letter of June 15th was an acceptance of the defendant's offer as contained in his letter of June 13th. When the defendant was by the plaintiff deemed in default, the latter wrote of its acceptance of defendant's proposal on June 15th, thereby referring to the letter of that date, and in the complaint the defendant's letter of June 13th and the plaintiff's letter of June 15th are declared to be the contract, and it was not until the end of the trial, wherein it appeared that no such letter had been received and no evidence of its mailing was given, although plaintiff believed that it had been mailed, that the complaint was amended to plead an oral unconditional acceptance by plaintiff, and thereupon the referee found an acceptance "on June 15, 1907, and also prior thereto." The referee had power to allow the amendment, and the evidence does sustain the finding of an oral acceptance.

[2,3] A writing similar to the letter of June 13th was by Stroock, plaintiff's agent, handed to Kessel, defendant's agent, with a statement that it "is the contract that we made. It is all satisfactory. You sign it and then get Mr. Talcott's signature to it." Later the proposal of June 13th, executed by Kessel and Talcott, was returned; but as the form of Talcott's execution did not conform to the paper first submitted, the executed paper was, after some telephonic conversation between the parties, submitted to defendant and later returned executed in the satisfactory form. The defendant's evidence contradicts essentially plaintiff's evidence, but the referee was justified in finding as he did. On the same day the letter of June 15th was written, but it is not in evidence. It was given to the office boy to be mailed, but there is no evidence of its mailing, but there is evidence that it was not received, and the answer so states. The letter indicates a state of mind, and is usable in considering the credibility of Stroock's testimony that he orally expressed approval of the contract subject to the correction that was made. It might well be concluded that the letter, supposed to be sent *after* the oral communications, embodied the plaintiff's final reply to defendant's proposition, especially as it and it alone was declared in the complaint to be such. But when the plaintiff was unable to establish it as such and defendant denied it, then it was necessary to ascertain what contract in fact was made, for some contract was made, as both parties contend, and was acted

upon and acknowledged in correspondence, and for the sale of goods, and relied upon for demands and counter demands.

Admittedly plaintiff's letter of June 15th was not in defendant's mind a part of the contract, and never operated upon defendant, unconscious of its existence. The defendant regarded his proposal as accepted, and acted accordingly. How did he think that it had been accepted unless orally or by the delivery of goods pursuant to the proposal? But the goods could be made only upon his initiation by designation of styles. So, under date of June 14th, there is a letter notifying plaintiff of styles, showing that some understanding had then been reached, and under date of June 20th a letter inquires for first anticipated delivery. So there are two more letters in June relative to expected deliveries. Starting with July 2d, the defendant continued his writings in the use of some contract, and plaintiff made relevant replies. On July 26th the defendant in writing made definite statement of complaints that the embossing was not permanent but practically disappeared in pressing, and refusal further to accept or retain such goods is found in later letters until, under the date of July 29th plaintiff wrote that the goods were unmerchantable, and that:

"It will be impossible for me to accept of any further quantities of the embossed plushes until such time as you can take the matter up with your manufacturer, in order to have the embossing created permanently."

And on July 31st the notice of refusal to accept goods in "their present condition" is repeated. On August 1st, the plaintiff wrote:

"We acknowledge receipt of yours of the 31st ulto. as to 27-inch embossed plushes ordered by you of us under contract dated June 13, 1907, and accepted by us June 15, 1907."

And among other things it is written:

"We beg to repeat that we have in every wise fulfilled the terms of that contract on our part and that we are prepared to continue so to do, if you will permit us," and that it will proceed "to manufacture and complete all goods now in process of manufacture under said contract and shall seek to deliver the same to you," and that it will hold defendant "liable in damages for breach of contract."

On August 12th the defendant replied that he would not further accept goods such as had been delivered, and:

"We also beg to notify you that our loss because of the defective quality of the goods delivered has already reached substantial figures for which we shall hold you responsible, and that unless you are able speedily to supply us with the goods contracted for of merchantable character and adapted to the purposes for which they were intended our claim against you for the resulting damage will be very large."

On August 13th the plaintiff answered, in recognition of a contract, and that, in view of defendant's refusal to accept more goods:

"We will complete that portion of your order which is now in the process of manufacture, and hold you for the same," etc.

Later the plaintiff sued, and defendant, among other things, alleged that the goods were purchased pursuant to his proposition and the goods delivered were not the goods specified in defendant's order. The defendant did regard the contract as closed, since he acted under

it, and insisted upon plaintiff's performing it pursuant to its terms. All that was done by defendant without knowledge of the letter of June 15th. The plaintiff's evidence of an oral acceptance is, in effect, a statement to defendant that if he would make one correction or addition the proposal would be satisfactory, which was done, and the proposal so changed returned, and the contract went into use. This, if credited, was an acceptance, and the later acts of the parties and practical use of the contract indicate that there had been an acceptance and in themselves tend to show an acceptance. Phillip v. Gallant, 62 N. Y. 256, 263; O'Donnell v. Clinton, 145 Mass. 461, 463, 14 N. E. 747; Anson on Contracts, p. 17.

[4] The next inquiry is: Did the goods delivered accord with the contract? The complaint, which led defendant to refuse deliveries, was that the embossing was not permanent and disappeared upon pressing, and it is alleged in the amended answer that the agreement implied that the goods would be merchantable for the purpose of manufacture into clothing, that they were not, and that the defect was latent and not discoverable upon inspection. The facts inducing the contract must be considered. The Stroock Plush Company manufactured plushes at Newburgh, and sold its product through S. Stroock & Co. at New York, where the defendant did business in such matters through Henry Kessel. Before Mark Stroock, agent, delivered a copy of the proposal of June 13th to Kessel, with what followed as above narrated, the two men had met and Stroock had delivered to Kessel three certain samples. They were satisfactory in appearance, and the goods delivered were at least as good as the patterns. The samples were made at the suggestion of Kessel, who submitted one or more specimens of more expensive goods as suggestions of what he wished; that is, a fabric with the appearance of fur. The goods were equal to the sample and in appearance were satisfactory. Kessel wished a fabric, plaintiff essayed to make it, and submitted the result, which satisfied Kessel, and so the contract followed. Upon its pile were impressed patterns by means of heated rollers, which varied in styles as the defendant designated. The defendant and all concerned for him must have known that the patterns were stamped on the goods. In any case, it is not proven that there was any better method of laying the designs on the surface of the goods, or one that would make the designs more durable, or any way of avoiding impairment by moisture and pressing. And yet the effacement of the impressed design was the fault appearing when the fabric was moistened for the purpose of pressing.

It would seem to come to the mind of a person of usual thought that figures caused by heat and pressure upon pile would be impaired by too great heat and moisture, and so the fact is proven. The plaintiff gave evidence tending to prove that no impairment followed effectual pressing without moisture with an iron moderately heated. That left the desideratum that the coats would not stand wetting, although the evidence of fading designs comes from the tailors and not from the wearers. Nevertheless, water and moisture would impair or obliterate the pattern. But it seems that the plaintiff, solicited by defendant to try what it could do to make goods that would com-

pete with an imported article, produced what seemed satisfactory, using a recognized method, and that doing it as well as it could be done, and with all attainable results for goods of that nature, failed to produce what would hold the surface design against exposure to wet and heat. The defendant's contention is that that deficiency disqualified the goods as merchantable, that the plaintiff should not have undertaken to make them, and that, as it did, it impliedly warranted that the designs would withstand pressing by heat and moisture. While the plaintiff was not told that the goods were to be used for cloaks, or was by the defendant's occupation or suggestion directed to consider that probability, yet the Stroocks must have known that such was one probable use of the material. But even so, the plaintiff is not deemed under the facts here presented to have warranted that they were so fit therefor that the designs would survive wetting.

The spirit and breadth of the rule is gathered by considering the language used to express it in Bierman v. City Mills Co., 151 N. Y. 482, 45 N. E. 856, 37 L. R. A. 799, 56 Am. St. Rep. 635. The action was to recover damages for breach of warranty in the sale of felt cloths for use in making ulsters and which proved essentially unfit for that purpose. The opinion of the court states:

"The question here, however, is one of a sale, where the seller was the manufacturer of the article sold, and the contract being executory in its nature and for the delivery of something of a particular kind, there was the implied warranty, or promise, that the article to be delivered should be merchantable and free from any remarkable defect. Mellor, J., in Jones v. Just, L. R. (3 Q. B.) 197, after reviewing decisions illustrative of when the rule of caveat emptor does or does not apply in sales, stated as one of the results, as follows: 'Where a manufacturer undertakes to supply goods, manufactured by himself, or in which he deals, but which the vendee has not had the opportunity of inspecting, it is an implied term in the contract that he shall supply a merchantable article.' The same principle was laid down in Howard v. Hoey, 23 Wend. 350 [35 Am. Dec. 572], and in Hoe v. Sanborn, 21 N. Y. 552 [78 Am. Dec. 163], with respect to the obligation of a seller, under an executory contract to deliver an indeterminate thing of a particular kind, that it shall be free from any remarkable defect. In Kellogg Bridge Co. v. Hamilton, 110 U. S. 108 [8 Sup. Ct. 537, 28 L. Ed. 86], after a review of the leading cases bearing upon the point, it was held that: 'When the seller is the maker or manufacturer of the thing sold, the fair presumption is that he understood the process of its manufacture, and was cognizant of any latent defects caused by such process and against which reasonable diligence might have guarded. * * * When, therefore, the buyer has no opportunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used due care, must have been informed during the process of manufacture. If the buyer relied, and under the circumstances had reason to rely, on the judgment of the seller, who was the manufacturer or maker of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed; the seller at the time being informed of the purpose to devote it to that use.' Quite recently, in the case of Carleton v. Lombard, 149 N. Y. 137 [43 N. E. 422], which was an action to recover damages for the breach of an executory contract for the sale of petroleum, produced by the defendant through certain manufacturing processes, we had occasion to consider the question of the liability of the seller for any latent defect arising in the process of the manufacture and the principle of the decisions in Hoe v. Sanborn, supra, and in Kellogg Bridge Co. v. Hamilton,

supra, was affirmed. We held there that the maxim caveat emptor does not apply to the case of a manufacturer, who sells goods of his own manufacture, and that, in such a case, he is liable, for any latent defects arising from the process of manufacture, or in the use of defective materials, upon the ground of an implied warranty."

The rule here adopted is compactly stated in Heath Dry Gas Co. v. Hurd, 193 N. Y. 255–259, 86 N. E. 18, 19 (25 L. R. A. [N. S.] 160):

"In this executory contract for the manufacture of goods to be delivered in the future, the law implied a warranty that the articles to be manufactured should be reasonably fit for the purposes for which they were intended and that they should be free from latent defects produced by the process of manufacture. Maurer v. Bliss, 6 N. Y. St. Rep. 224, affirmed 116 N. Y. 665 [22 N. E. 1135]; Hoe v. Sanborn, 21 N. Y. 552 [78 Am. Dec. 163]; Gutwillig v. Zuberbier, 41 Hun, 361; Kellogg Bridge Co. v. Hamilton, 110 U. S. 108 [8 Sup. Ct. 537, 28 L. Ed. 86]."

It is noted that there is a reference in both cases to Kellogg Bridge Co. v. Hamilton, 110 U. S. 108, 8 Sup. Ct. 537, 28 L. Ed. 86. There the rule for which the defendant now makes a contention is fairly stated, but it is concluded that the decision in Seitz v. Brewers' Refrigerating Co., 141 U. S. 510, 12 Sup. Ct. 46, 35 L. Ed. 837, is more applicable to the case at bar. Respecting these two cases, it was said in Pullman Car v. Metropolitan Railway Co., 157 U. S. 94, 108, 15 Sup. Ct. 503, 506 [39 L. Ed. 632]:

"The subject of implied warranty in sales of personal property was examined by this court in Kellogg Bridge Company v. Hamilton, 110 U. S. 108–116 [8 Sup. Ct. 537, 28 L. Ed. 86], and, subsequently, in Seitz v. Brewers' Refrigerating Co., 141 U. S. 510, 518 [12 Sup. Ct. 46, 35 L. Ed. 837]. In the first of those cases it was said that: 'When the seller is the maker or manufacturer of the thing sold, the fair presumption is that he understood the process of its manufacture, and was cognizant of any latent defect caused by such process, and against which reasonable diligence might have guarded. This presumption is justified, in part, by the fact that the manufacturer or maker, by his occupation, holds himself out as competent to make articles reasonably adapted to the purposes for which such or similar articles are designed. When, therefore, the buyer has no opportunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used due care, must have been informed during the process of manufacture. If the buyer relied, and under the circumstances had reason to rely, on the judgment of the seller, who was the manufacturer or maker of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed; the seller at the time being informed of the purpose to devote it to that use.' This principle was reaffirmed in the other case above cited, and it was there said: 'But it is also the rule, as expressed in the text-books and sustained by authority, that where a known, described, and definite article is ordered of a manufacturer, although it is stated by the purchaser to be required for a particular purpose, still, if the known, described, and definite article be actually supplied, there is no warranty that it shall answer the particular purpose intended by the buyer.' "

In this connection attention may also be called to the decision in Maurer v. Bliss, 6 N. Y. St. Rep. 224, affirmed 116 N. Y. 665, 22 N. E. 1135, to the effect that when a well-known article is to be manufactured for experimental purposes, it can only be demanded of the manufacturer that it shall be reasonably good of its kind.

The defendant places much reliance upon Drummond v. Van Ingen, 12 Appeal Cases (L. R.) 284. There the parties had previous dealings, and those known to the manufacturer to be dealers in woolen and worsted cloths gave orders for worsted coatings to correspond in quality and weight with such as had been formerly supplied to the manufacturer. It turned out that owing to the mode of manufacture there was a decided tendency in the warp to slip in the weft, so that the cloth could not be used for the purpose of being made into coats in the manner usual with goods of the same general description and quality, and that they could only be made into garments capable of resisting ordinary tension by the adoption of special precautions both in regard to breadth of seam and method of sewing. There were several opinions in the House of Lords, and the grounds of decision were not common, although it was accepted that the order made for worsted coatings indicated to the manufacturer the use to which the material would be put and placed upon him the corresponding duty.

I think it must be conceded that there are statements in some of the opinions that make strongly for the defendant's contention. For instance, Lord Macnaghten says:

"When a manufacturer proposes to carry out the ideas of his customer, and furnishes a sample to show what he can do, surely in effect he says: 'This is the sort of thing you want. The rest in my business. You may depend upon it that there is no defect in the manufacture which would prevent goods made according to that sample from answering the purpose for which they are required.' As against the manufacturer I think it must be taken that the sample is free from all hidden defects of manufacture which would interfere with the proper use of the manufactured article. If the manufacturer supplies goods corresponding with the sample, but free from all such defects, he fulfills his bargain. If that is beyond his power, he must be responsible for undertaking more than he is able to perform."

But this decision received later consideration in Jones v. Padgett, 24 Law Reports, Queens Bench Division, 650, where woolen manufacturers contracted with the plaintiff as a woolen merchant to manufacture and supply indigo blue cloth according to sample. The plaintiff intended to use the cloth in his tailor's business for the purpose of making it into servants' liveries; but neither the fact that the plaintiff buyer was a tailor nor that he intended to use the cloth for liveries was known to the seller. There was evidence that one of the ordinary uses to which that particular kind of cloth was applied was the making of liveries. The cloth supplied corresponded with the sample; but, owing to a latent defect, it was unsuited for manufacture into liveries, though not unsuitable for other purposes for which similar cloth was frequently used, and it was determined that there was no implied warranty that the cloth was fit for use for liveries. It was stated in the opinion that it was not intended in Drummond v. Van Ingen to extend the rule, and that the case at bar was not within the usual rule, because nothing was mentioned to the seller as to the particular purpose for which the cloth was intended, and that there was nothing to fix him with knowledge of that purpose, beyond the position of the parties. I consider that the rule does not mean that a manufacturer who is solicited to make a defi-

nite fabric, and who makes it, undertakes that it will do what the person presenting it expects that it will do and so be marketable.

In the present case the product exactly corresponds to the thing proposed, and so, aside from the fact that for a cheap fabric it is strong and useful, if properly used, the manufacturer has fulfilled his duty. The fault in the goods, impairment or effacement of designs upon exposure to moisture, is inherent in their nature, and cannot be prevented by manufacture. So the law contemplates that the parties understood that the plaintiff should do just what it did by available process. In such case the consequence of unmarketability is at the risk of the person who solicited the manufacturer. Within the spirit of such decisions the plaintiff did not warrant that the long pile on the goods on which the manufacturer was asked to fashion designs would not resume its normal shape when heat and water did what it always tends to do; that is, erase the stamp. The remaining inquiry relates to the damages.

The damages allowed are: (1) $4,598.04, balance unpaid for goods delivered; (2) $12,975.94 for tendered goods refused; (3) $14,832.30 for loss of profits for goods that plaintiff was entitled to deliver under the contract, with interest. It is among the things objected that in arriving at these amounts the referee has not allowed the plaintiff the benefit of the 7 per cent. discount, which amounts to 4.69 cents per yard. The letter of June 13th provides:

"Price is 62½¢ per yard. Terms—Settlements to be made on the 10th of each month for goods delivered during the preceding month, less 7 per cent. cash discount."

[5] The first cause of action is for the balance unpaid on deliveries of goods at 62½ cents per yard, which price was reducible by 7 per cent., provided it had been paid on the 10th of the month following the month of such deliveries. The condition on which the discount was available did not arise. The goods made and tendered should have been paid for on the 10th of 'the month following the month of tender. The defendant not only did not pay at the appointed time, but also refused the goods. He did not earn the discount.

[6, 7] The question becomes debatable as to profits on manufactured goods. Here the plaintiff is suing for the value of its contract, and the question is: What did it lose in profits by defendant's failure to take the goods and pay for them at appointed time? In such case the court finds what deliveries of unmade goods could have been made during the continuance of the contract for which payment should be made pursuant to the contract on the 10th day of the following month at the rate of 62½ cents per yard, less 7 per cent. discount. That is, the court first views the contract as duly performed and then as unperformed, and from the sum that the plaintiff would have received from performance by defendant subtracts the cost of performance on its part, and the difference is the profit. For such calculation the price receivable per yard upon payment on the due day is 62½ cents per yard, less 7 per cent., from which is deducted cost of performance by plaintiff. I consider that it was error for

the purpose of such compensation to consider the price of 62½ cents net on the pay day, inasmuch as the performance of the contract is presupposed as a basis of calculation. It will be observed that the discount is allowable on the only fixed day of payment, and that if payment be not made on that day a cause of action for nonpayment would arise. The referee found the lost profit to be $14,832.30, and that the net profit was 20.89 cents per yard, deducting the discount from the purchase price. In his report the learned referee did not find specifically the number of yards on which he based the finding of profits, but in response to the defendant's request did find that had the plaintiff continued the manufacture subsequent to August 12th to October 1st, when the contract expired, it would not have tendered more than 7,000 yards per week for the seven weeks, or, in all, 49,000 yards, and that the profit thereon at the rate of 20.89 cents per yard would not have exceeded $10,285.10. This shows apparent error in the finding of $4,547.

But the plaintiff answers that the finding relates to lost profits only between August 12th and October 1st, but that between July 27th, when defendant wrote that it would receive no more goods, and August 12th, the plaintiff finished what it had in process of manufacture, and that it lost profits on that on which the referee based its finding in part. But I understand that all goods finished under the contract were tendered and that the plaintiff has received full payment therefor. The finding follows the complaint and is that between July 23d and August 14th the plaintiff manufactured and tendered 20,761½ yards, and for them the purchase price is allowed. I do not find any reference to goods made and not tendered after July 27th. For such goods the plaintiff would receive the purchase price. The plaintiff's damages are distributed to goods accepted, tendered, and to cash profits. There is no cause of action stated for loss of profits on goods partially manufactured at the time of defendant's breach of the contract. There were no goods tendered after August 14th. The evidence shows that goods in the process of manufacture on July 27th "were from the starting condition to practically the finishing condition," and they were all finished by August 16th. But what part of them was tendered does not appear, but the last tender was August 14th. In this state of the record there is opportunity for double recovery.

[8] The plaintiff was entitled to finish the goods in course of manufacture and recover therefor.

As we find no other errors, the judgment should be modified by deducting from the damages found the sum of $4,547.50, with interest from December 27, 1910, the date of the report, and as so modified affirmed, without costs. All concur.