OPINION OF THE COURT
Jack M. Battaglia, J.
Shalom Malul contracted with Capital Cabinets, Inc. for new kitchen cabinets. Dissatisfied with the purchase, Mr. Malul has sued Capital and two individuals associated with Capital, David Hershkowitz and Hona Hershkowitz. At the January 15, 2002 trial, Mr. Malul appeared and testified. Capital and the individual defendants were represented by Sol Mermelstein, Esq. Sidney Friedman and Patrick Gangitano testified on behalf of the defendants.
At the conclusion of plaintiffs case, defendants David Hersh-kowitz and Hona Hershkowitz moved for dismissal. The court granted the motion, seeing no basis in plaintiffs evidence for any liability of the individual defendants.
In a writing dated August 11, 1999, the parties agreed to the purchase and sale of cabinets manufactured by Holiday Kitchens for a total purchase price of $10,900. In its advertising, Capital says that it is the “exclusive authorized distributor” of Holiday Kitchens. The writing included a drawing showing how the cabinets would be arranged in plaintiffs kitchen, together with appliances, and contained the dimensions and other descriptive information about the cabinets. Of the total purchase price, $3,000 was paid on signing of the contract, and $7,900 was paid on December 30, 1999 upon delivery of the cabinets by the manufacturer.
The contract for the cabinets did not provide for installation. On Capital’s recommendation, Mr. Malul hired Barry Burger to install the cabinets and paid him $1,600 to do so. Despite Mr. Burger’s role in the cabinet project, and the significance of installation to some of the problems that developed, he did not testify at trial. Since Mr. Burger has a relationship with both Capital and Mr. Malul, and neither party offered any explanation for his failure to testify, the court makes no negative inference because of his absence.
The installation of the cabinets began in January 2000 and was completed, to the extent possible, in March. Not all of the *401 pieces had been delivered, but Capital committed to get them. Meanwhile, on April 3, Capital and Mr. Malul entered into a second contract for additional cabinets at the total price of $2,300. Sometime in April, the additional cabinets were delivered and installed by Burger.
According to Mr. Malul, within a couple of weeks, the doors on several of the cabinets began to “melt,” i.e., the laminate began to “pull” from the substrate. As later explained by Mr. Gangitano, the doors are thermafoil coated, produced by applying a heated laminate over medium density fiberboard. (A General Technical Information sheet distributed by Holiday Kitchens describes the doors as “foil-wrapped.”) Several of the doors were replaced by Capital a number of times, but the problem recurred with the replacement doors. Mr. Malul testified that 6 of the total of 30 doors evidenced the problem.
In addition to the “melting” doors, Mr. Malul testified to other problems: three doors are not of the design ordered, and, although they have been replaced twice, they are still wrong; panels for the refrigerator and dishwasher were the wrong size, and have yet to be replaced; molding is missing in some places, and putty used instead of formica in others; doors and drawers are crooked; and the oven and refrigerator were installed in such a manner that it is difficult to open the refrigerator. Mr. Malul produced a “melted” door and photographs illustrating most of these problems.
Patrick Gangitano is an independent representative for Holiday Kitchens, having served in that capacity for 10 years. In addition to describing the process, he testified that the cabinet doors were not manufactured by Holiday, but purchased from a supplier. After Mr. Malul’s complaints, he inspected Mr. Ma-lul’s cabinets, and concluded that the melting phenomenon was due to excessive heat, the result of the doors being placed too close to a heat source, primarily the stove. Although he acknowledged that Mr. Malul’s experience was not unique, he asserted that, of the thousands of similar doors sold, “less than a dozen” have this problem.
Mr. Gangitano also produced the General Technical Information sheet distributed by Holiday Kitchens. The sheet contains a “manufacturer’s limited warranty” in which the “supplier of Foil Wrapped Doors warrants to the original purchaser that all doors * * * are guaranteed for a period of five (5) years against * * * delamination where proper care and handling is maintained * * * Any product that has been exposed to temperatures over 185° F (85° C) will void the warranty.” Although Mr' *402 Gangitano maintains that this would have been sent to Mr. Malul by Holiday, Mr. Malul denies having received it. There is no evidence that Capital received it either.
Indeed, Sidney Friedman, the Capital salesperson who dealt with Mr. Malul, testified that Capital knew nothing about the potential problem with heat until after Mr. Malul’s complaints. Before the sale to Mr. Malul, Capital had never sold thermafoil before. Mr. Friedman testified that Mr. Malul gave him the exact model and color information which Mr. Malul had obtained from another seller. Mr. Malul disputes this, saying that he chose the finish and color from catalogues that Mr. Friedman gave him to review. He says that he told Mr. Friedman, “Give me your opinion, I want something good.” There is no question that the August 11, 1999 contract designates the thermafoil product and a color number that applies only to that product.
Another significant dispute between Mr. Malul and Mr. Friedman concerns the drawing for the kitchen. Mr. Friedman testified that Mr. Malul appeared with a drawing in hand, and insisted that it be followed. Mr. Malul said that he and Mr. Friedman designed the kitchen together.
As to the specific complaints, Mr. Friedman maintained that he heard no complaint about the placement of the refrigerator and stove until a year and a half later, although the problem could have been solved at installation. Also, the doors and drawers are not crooked; there are only some “hairline” spaces; the panels for the refrigerator and dishwasher must be cut to the dimensions of the particular appliances, which Holiday is willing to do with the manufacturers’ specifications. Other problems, he said, were Burger’s responsibility.
The contract between Mr. Malul and Capital was for the sale of goods, and, therefore, is governed by article 2 of the Uniform Commercial Code. (UCC 2-102.) Even accepting Mr. Malul’s version as to the design of the kitchen, the sale of the cabinets clearly predominated. (Milau Assoc. v North Ave. Dev. Corp., 42 NY2d 482, 486 [1977]; Nickel v Hyster Co., 97 Misc 2d 770, 773 [Sup Ct, Suffolk County 1978].) It also seems clear that Mr. Malul accepted the cabinets. (UCC 2-606 [1] [c].)
Before Mr. Malul can have a remedy, either after revocation of acceptance (UCC 2-608, 2-711), or for breach in regard to accepted goods (UCC 2-714), he must first show that Capital failed to perform according to the contract. Mr. Friedman testified that no oral warranty or representation was made in connection with the transaction, and Mr. Malul did not contradict *403 him. No formal written warranty was produced by Mr. Malul, nor did he contend that he had received one.
Mr. Malul did present a copy of an advertisement by Capital, which he acknowledged to be recent, that states “Holiday Kitchens Protection Guarantee 5/20” and “Custom Cabinetry Built to Last a Lifetime.” Neither statement qualifies as an express warranty on behalf of Capital. The first is accompanied in the ad by the Holiday Kitchens logo and the legend “Exclusive Authorized Distributor of Holiday Kitchens.” Taken together, the statements seem clearly to refer to some written warranty by Holiday Kitchens. The second is puffing. (UCC 2-313 [2].) In any event, Mr. Malul did not testify to his having seen a similar advertisement prior to the contract, so that it might be deemed a basis of his bargain with Capital. (UCC 2-313 [1]; see Strauss v Long Is. Sports, 60 AD2d 501, 506 [2d Dept 1978]; White and Summers, Uniform Commercial Code, § 9-5, at 353 [5th ed].) He testified that he went to Capital because of his father’s relationship with a principal in the company.
An implied warranty of fitness for a particular purpose arises “[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller’s skill or judgment to select or furnish suitable goods.” (UCC 2-315.) Even accepting Mr. Malul’s version as to how the thermafoil product came to be designated in the contract, this warranty would not be implied in this transaction. Mr. Malul’s statement that he was relying on Mr. Friedman’s opinion for “something good” does not convey any particular purpose. (See White and Summers, supra, § 9-10, at 369.)
An implied warranty of merchantability is implied in a contract for sale of goods, “if the seller is a merchant with respect to goods of that kind.” (UCC 2-314 [1]; 2-104 [1].) Even though Capital may not have previously sold a thermafoil product, it was a merchant of cabinets, and that is enough. “Goods to be merchantable must be at least such as * * * are fit for the ordinary purposes for which such goods are used.” (UCC 2-314 [2] [c].)
“A specific designation of goods by the buyer does not exclude the seller’s obligation that they be fit for the general purposes appropriate to such goods.” (UCC 2-314, Comment 3.) On the other hand, “where the buyer gives detailed specifications as to the goods,” i.e., “precise and complete specifications,” the implied warranty does not apply; it is deemed “displaced by *404 the express warranty that the goods will comply with the specifications.” (UCC 2-316, Comment 9; 2-317; see also UCC 2-315, Comment 5.)
Even accepting Mr. Friedman’s version as to how the thermafoil product came to be designated in the contract, the implied warranty of merchantability applies in this transaction. Well before adoption of the Uniform Commercial Code, New York law provided for an implied warranty of merchantability that applied even when the buyer designated the goods by trade or brand name. (See Ryan v Progressive Grocery Stores, 255 NY 388 [1931]; Shampine v Fleming, 280 App Div 558 [3d Dept 1952]; Kelvinator Sales Corp. v Quabbin Improvement Co., 234 App Div 96 [1st Dept 1931]; Foley v Liggett & Myers Tobacco Co., 136 Misc 468 [App Term 1930], affd 232 App Div 822 [2d Dept 1931]; Zampino v Colgate-Palmolive Co., 10 Misc 2d 686 [Sup Ct, Montgomery County 1958], revd on other grounds 8 AD2d 304 [3d Dept 1959]; Marino v Maytag Atl. Co., 141 NYS2d 432 [Mun Ct, Bronx County 1955].)
The question here is whether, assuming that Mr. Malul stated that he wanted “thermafoil” doors, or designated a color (R-70PL) that could only mean “thermafoil,” he provided “precise and complete specifications” (supra), so as to have, in effect, relieved Capital of any responsibility for the characteristics or performance of the goods. (See also Leahy v Mid-West Conveyor Co., 120 AD2d 16, 18-19 [3d Dept 1986].) There can be little doubt, based on the testimony, that any designation Mr. Malul may have made related solely to aesthetic characteristics of the doors — specifically, color and finish — and not functional or performance characteristics. Nor is there much doubt that Mr. Friedman fully understood that. There is no evidence that Mr. Malul was ever told, by Mr. Friedman or anyone else at Capital, that thermafoil doors carried limitations that wood doors did not.
Were the goods “fit for the ordinary purposes for which such goods are used”? (UCC 2-314 [2] [c].) Mr. Malul does not contend that “melting” doors in any way interfered with the use of the cabinets to store kitchen items. There is Second Department authority that suggests that fitness is determined by functional characteristics. In Horowitz v Sears, Roebuck & Co. (137 AD2d 492 [2d Dept 1988]), appliances defaced with swastikas were found not to breach the implied warranty of merchantability, because “the appliances at issue were fit for their ordinary purposes of laundering clothing.” (Id. at 492; see also Epstein v Mullins & Sons, 266 App Div 665 [2d Dept *405 1943].) However, in a Third Department case, kitchen cabinets were found to breach an unspecified warranty, in part because “the finish began to chip and peel and the cabinets began to warp.” (Mayfair Kitchen Ctr. v Nigro, 139 AD2d 885, 886 [3d Dept 1988].)
Whether and to what extent the implied warranty of merchantability includes aesthetic characteristics must depend on the nature of the goods and the buyer’s reasonable expectations. In one of the earliest cases dealing with the implied warranty, the Second Department considered whether fabric sold for manufacture into clothing was marketable when the embossed designs disappeared upon pressing. (Stroock Plush Co. v Talcott, 150 App Div 343 [2d Dept 1912].) Benjamin N. Cardozo, representing the seller, convinced the Court that the warranty was not breached under the facts, but there is no suggestion in the rather lengthy opinion that the loss of the design could not occasion a breach of the warranty. (See also Frantz v Cantrell, 711 NE2d 856 [Ind App 1999] [roof shingles]; Meldco, Inc. v Hollytex Carpet Mills, 118 Idaho 265, 796 P2d 142 [1990] [carpeting]; Martin v Dinmark, 531 So 2d 1234 [Ala Civ App 1988] [clothing]; Duff v Bonner Bldg. Supply, 103 Idaho 432, 649 P2d 391 [1982] [wood paneling]; Tracy v Vinton Motors, 130 Vt 512, 296 A2d 269 [1972] [paint finish on car].)
Here, Capital does not contend that Mr. Malul can have no complaint simply because the cabinets are still fit for storage. Indeed, its advertisement is comprised in substantial measure of a picture of an “actual kitchen created by” Capital, clearly intended to trade on the aesthetic appeal of the cabinetry. Moreover, the ad states, “Quality Does Not Cost * * * It Pays,” confirming that “the price at which the merchant closes a contract is an excellent index of the nature and scope of his [sic] obligation under” the implied warranty of merchantability. (UCC 2-314, Comment 7.)
But Capital argues, in effect, that Mr. Malul was not using the cabinets for “ordinary purposes” in that the doors were exposed to temperatures that would have voided the “manufacturer’s limited warranty.” The question of fitness “focuses on the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners.” (Denny v Ford Motor Co., 87 NY2d 248, 258-259 [1995].) “To establish a claim for breach of an implied warranty, plaintiff was required to show that the product * * * was not reasonably fit for the purposes for which it was intended.” (Finkel-stein v Chevron Chem. Co., 60 AD2d 640, 641 [2d Dept 1977].)
*406 On the other hand, there are “defenses” to a claim for breach of implied warranty, and defendant has the burden of establishing a defense. “Defenses available to claims of breach of the implied warranty of merchantability include the buyer’s contributory conduct * * * [T]he focus is on factors that may sufficiently attenuate the causal connection between the defendant’s acts and the plaintiffs injury to bar recovery.” (Bellevue S. Assoc. v HRH Constr. Corp., 78 NY2d 282, 298 [1991] [internal quotation marks omitted], quoting 1 White and Summers, Uniform Commercial Code § 11-8, at 541 [Practitioner’s 3d ed].) Among the available “defenses” is “misuse” of the product. (Carbone v Alagna, 239 AD2d 454, 456 [2d Dept 1997].) However, “culpability on the part of a [claimant] in mishandling the product * * * will not bar recovery unless that conduct is found to be the sole cause of the [claimant’s] injury.” (Schafer v Standard Ry. Fusee Corp., 200 AD2d 564, 565 [2d Dept 1994].)
Moreover, even when the product is being used “in some abnormal way,” the seller may still be found liable for failure to warn of the hazards that may follow “when it is proved that the abnormal use of the product in question was reasonably foreseeable.” (Johnson v Johnson Chem. Co., 183 AD2d 64, 69 [2d Dept 1992].) On the other hand, “there is no liability for failure to warn where such risks and dangers are so obvious that they can ordinarily be appreciated by any consumer to the same extent that a formal warning would provide * * * or where they can be recognized simply as a matter of common sense.” (Carbone v Alagna, 239 AD2d 454, 456 [2d Dept 1997] [internal quotation marks omitted], quoting Bazerman v Gardall Safe Corp., 203 AD2d 56, 57 [1st Dept 1994].) Although “failure to warn” analysis is usually found in product liability actions based in tort, it is also relevant in the warranty context. (See Yates v Norton Co., 403 Mass 70, 525 NE2d 1317, 1320 [1988].) Warnings help define “ordinary use,” and are, therefore, appropriate to determinations of fitness and misuse.
There was no evidence that the doors sold to Mr. Malul were, in fact, exposed to temperatures over 185 degrees F. Whether Mr. Gangitano’s inspection visit lasted “five seconds,” as Mr. Malul testified, or some longer period, apparently no attempt was made to quantify the exposure. There was no evidence that, despite his denial, Mr. Malul received the General Technical Information sheet that warned of exposure to temperatures over 185 degrees F, and no evidence of any other warnings or instructions. Even if, as Mr. Friedman testified, Mr. Malul *407 provided the design for the kitchen — and, therefore, determined the placement of the cabinets with respect to the appliances— Capital should have told Mr. Malul if there was some risk associated with his design. The fact that Capital may not have been advised of the risk by Holiday might give Capital a basis to look to Holiday for ultimate responsibility, but does not relieve Capital of its own responsibility to its buyer.
A buyer of kitchen cabinets would reasonably expect that they could be used near a stove without the doors “melting.” The court has examined one of the doors and photographs of others. The photographs also show the placement of the cabinets and appliances, including the stove. The court finds the condition to materially affect the aesthetic quality of the doors, and the placement of the cabinets in relation to the stove is reasonably common and to be expected. In the absence of any presale warnings, the implied warranty of merchantability has been breached.
There has also been a breach of warranty with respect to the design of three of the doors and with respect to the panels for the refrigerator and dishwasher. The warranty is deemed an express warranty that the goods will conform to the description in the contract. (UCC 2-313 [1] [b].) Although the contract here is not itemized with specific descriptions, it does state “French doors” for certain cabinets, and Mr. Malul testified that they have not been provided. As to the panels, Mr. Friedman acknowledged that they were included in the contract.
Other than the problems with the doors and panels, the court finds that Mr. Malul has not established that the goods failed to conform to the contract, including any express and implied warranties. The implied warranty of merchantability does not promise perfection, and there was no express warranty that the cabinets would be perfect. (See Pronti v DML of Elmira, 103 AD2d 916, 917 [3d Dept 1984].) Based upon the photographs and the testimony, the court finds that, except for the doors and panels, the cabinets were within the range of the minimally acceptable. Other problems relate to the installation, or could have been corrected on installation. Capital was not responsible for installation, and its recommendation of Mr. Burger did not make Capital a guarantor of his work.
In addition to proving breach of warranty, Mr. Malul must also prove his damages. Other than establishing the purchase price of the goods, Mr. Malul presented no evidence of damages. He would be entitled to a return of his purchase price only if he effectively revoked his acceptance of the goods. *408 (UCC 2-608, 2-711 [1].) Even if he may revoke acceptance of the doors alone, “there is no evidence of the unequivocal timely notice required by UCC 2-608 (2).” (Sears, Roebuck & Co. v Galloway, 195 AD2d 825, 827 [2d Dept 1993].) Mr. MaluTs “complaints were a request for a cure and not a clear and unequivocal act” of revocation. (Hooper Handling v Jonmark Corp., 267 AD2d 1075, 1076 [4th Dept 1999].)
“The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.” (UCC 2-714 [2].) This “describes the usual, standard and reasonable method of ascertaining damages in the case of breach of warranty but it is not intended as an exclusive measure.” (UCC 2-714, Comment 3.)
In a case close to this one, Mayfair Kitchen Ctr. v Nigro (supra), the Third Department held that the cost of replacing the defective cabinets “was not evidence of a difference in value.” (139 AD2d at 887.) In the absence of evidence of difference in value, the Court allowed as damages the “cost of restoration and repair.” (Id.) However, in a subsequent case involving display cabinets, the Third Department awarded damages based on replacement cost, because the cabinets, “custom designed specifically” for the buyer, were “unique goods not bought and sold on the open market.” (Gem Jewelers v Dykman, 160 AD2d 1069, 1071 [3d Dept 1990].) Other courts, including the Second Department, have awarded replacement cost without noting an exception to the rule. (See Carbo Indus. v Becker Chevrolet, 112 AD2d 336, 340 [2d Dept 1985] [automobile engine]; White and Summers, supra, § 10-2 [a], at 376-378.)
An award of the purchase price (as opposed to replacement cost) can under some circumstances result directly from the difference in value formula. “In the absence of testimony to the contrary, the contract is to be regarded as representing the value of the furniture if it had answered to the implied warranty.” (Schlossman & Sons v Gotte, 13 NYS2d 413, 414 [App Term, 1st Dept 1939]; see also City of New York v Pullman Inc., 662 F2d 910, 916 [2d Cir 1981]; Ritter v Erlich, 152 F2d 181, 183 [2d Cir 1945].) If the defective goods are then determined to be “worthless,” the difference in value is the purchase price. (See Peak v Northway Travel Trailers, 260 AD2d 840, 842 [3d Dept 1999].)
*409 Here, there was no evidence to suggest that there was a market for the “melted” doors (except, perhaps, for some nominal salvage value). Nor was there any evidence that they could be repaired; Capital attempted a cure by replacement, not repair. To the buyer, the unsightly condition of the doors render them effectively worthless. Whether characterized as “special circumstances” or on application of the difference in value formula, the purchase price of the doors is an appropriate measure of damages.
Even so, Mr. Malul testified that only 6 doors of the total of 30 purchased were “melting,” and the contract does not show a separate price for any of the doors, or for any of the cabinets, panels, etc., that comprise the goods. There was no evidence to suggest that any additional doors would melt, and approximately two years have elapsed since their installation. There was no evidence that all of the doors would need to be replaced for aesthetic reasons. (See, for example, Frantz v Cantrell, supra at 861.)
Mr. Friedman testified to a price per door of between $100 and $150; he did not differentiate as to dimensions, design (e.g., “French doors”), or any other characteristic that might affect price. Since Capital drafted the contract, and apparently chose not to itemize prices, it is appropriate to use the higher amount in computing Mr. Malul’s damages for the doors. That total would be added to the prices for the appliance panels, which Mr. Friedman testified to be $600 each.
It is worth noting that, at trial, Mr. Friedman stated that Holiday is willing to replace Mr. Malul’s “melting” doors yet again, so long as Mr. Malul recognizes the limitations on their use. In addition, Mr. Friedman stated that appliance panels of the proper size would be manufactured, if Mr. Malul could provide the necessary specifications. This suggests that the parties may yet be able to reach a more satisfactory resolution than this court can order.
Meanwhile, the court determines Mr. Malul’s damages for breach of warranty to be $2,550, representing the price of nine doors (six “melting” and three of the wrong design) and the price of two panels. Mr. Malul is also entitled to interest for breach of contract “from the earliest ascertainable date the cause of action existed.” (CPLR 5001 [b].) Under the Code “[a] cause of action accrues when the breach occurs,” and “[a] breach of warranty occurs when tender of delivery is made.” (UCC 2-725 [2].)
Judgment is awarded to plaintiff for $2,550, with interest from April 1, 2000, with costs. The award is conditioned on Mr. *410 Malul’s tender of the nine doors and two panels, to the extent not already returned.