(276 P.3d 773)
No. 103,952

BRENDA GOLDEN, *Appellant*, v. DEN-MAT CORPORATION, A Foreign Corporation, CERINATE CORP, A Foreign Corporation, DEN-MAT HOLDINGS, LLC, A Foreign Corporation, and DR. CARISSA M. GILL, *Appellees*.

452

Opinion filed May 4, 2012.

*Clifford L. Bertholf*, of Wichita, for appellant.

*David R. Buchanan* and *Grant D. Henderson*, of Brown & James, P.C., of Kansas City, Missouri, for appellees Den-Mat Corporation, Cerinate Corp., and Den-Mat Holdings, LLC.

*Patrick J. Murphy* and *James L. (Jay) MowBray*, of Wallace, Saunders, Austin, Brown & Enochs, Chtd., of Wichita, for appellee Dr. Carissa M. Gill.

Before ATCHESON, P.J., MALONE and MCANANY, JJ.

ATCHESON, J.: Plaintiff Brenda Golden purchased dental veneers—porcelain overlays meant to improve the appearance of teeth—that Defendant Den-Mat manufactured and marketed and Defendant Dr. Carissa M. Gill, a dentist, put in place. Golden contends the veneers became discolored and stained despite representations from Den-Mat and Dr. Gill that they would retain their appearance. So she sued them in Sedgwick County District Court on the grounds the veneers breached implied warranties applicable to goods sold under Article 2—Sales of the Uniform Commercial Code (UCC), K.S.A. 84-2-101 *et seq.*, and the transaction entailed deceptive acts and practices and improper limitations of those warranties in violation of the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.* The district court granted summary judgment to Den-Mat and Dr. Gill. Golden has timely appealed. We reverse and remand the case for trial, except for one claim under the KCPA on which summary judgment was properly entered.

The district court relied primarily on arguments that Golden failed to file suit within the appropriate statutes of limitations. After setting out the factual history and procedural development of the case, we first address those bases for summary judgment. The district court improperly characterized Golden's claims as torts and, therefore, applied the incorrect limitations period. The evidence does not support summary judgment on the proper limitations for UCC and KCPA claims.

The district court also determined summary judgment to be proper on substantive grounds related to some of Golden's claims. Dr. Gill made additional arguments in the district court and again on appeal that she contends would warrant summary judgment. To a lesser extent, Den-Mat has asserted alternative arguments. We address those contentions as well.

Because of the breadth of the issues, this opinion delves into the law governing express and implied warranties under the UCC, de-

ceptive and unconscionable acts and practices under the KCPA, and the interplay of those two statutory schemes as they apply to contracts for the sale of goods to consumers. The unusual nature of the goods involved—dental veneers—has required an especially searching inquiry regarding the UCC. That search turned up no other directly analogous cases. Nonetheless, settled principles developed under the UCC and the KCPA undercut summary judgment based on the substantive grounds the district court actually cited and on the substantive grounds the defendants suggest as legal backstops.

We conclude that factual disputes remain as to: (1) the application of the UCC to the transaction; (2) the scope and breach of express warranties regarding the veneers; (3) the scope and breach of implied UCC warranties of merchantability and fitness of the veneers for a particular purpose; (4) whether Den-Mat or Dr. Gill engaged in deceptive acts or practices in violation of the KCPA; and (5) whether Den-Mat or Dr. Gill improperly attempted to limit those implied UCC warranties in violation of the KCPA. We conclude the district court properly granted summary judgment on Golden's claim that any attempt to limit the UCC warranties amounted to an unconscionable act or practice under K.S.A. 50-627 in violation of the KCPA. That's only because such an attempt specifically violates K.S.A. 50-639 and is outside the scope of K.S.A. 50-627.

## Factual and Procedural History

Because the district court entered summary judgment against Plaintiff Golden, we review the facts in the light most favorable to her. So our narrative presents the events that way. Before turning to that recitation, we note that Defendants Den-Mat Corporation, Cerinate Corporation, and Den-Mat Holdings, LLC appear to be united in interest and are represented by the same counsel. Neither the facts, as we understand them, nor the legal issues on appeal require we distinguish among those defendants. We refer to them collectively as Den-Mat.

In late 2004, Golden wanted to replace the veneers on her teeth with new ones that would give her smile what she described as a

"super white" appearance. Veneers are synthetic panels cemented to the front of a person's teeth, thereby covering discoloration or other imperfections in the natural dentition. Golden saw a magazine advertisement for Cerinate veneers, a proprietary product Den-Mat manufactures. In response to her telephone call to the number in the advertisement, Den-Mat sent Golden a brochure describing the Cerinate veneers as "thin porcelain shields . . . bonded to the front of" the teeth "to create dramatic changes in your smile." The brochure touted "long-term clinical research" showing the Cerinate veneers would last up to 16 years "with no discoloration" and "100% retention." The brochure also explained that the porcelain veneers "are stronger and more durable" than comparable products made from plastic. According to the brochure, "[s]ometimes plastic composites stain and discolor with age, whereas, Cerinate Veneers maintain their beautiful luster and vitality." The brochure referred several times to the durability of the veneers and promoted the "strong, patented adhesive" used to attach them. The brochure, however, contained no unequivocal statement that the veneers would not come loose or crack.

Golden decided to get the Cerinate veneers and contacted Den-Mat for a dentist in the Wichita area. Den-Mat supplied Golden with Dr. Gill's name and contact information as the nearest professional authorized to apply Cerinate veneers. Dr. Gill worked in Wellington, some 35 miles south of Golden's home.

Golden first met with Dr. Gill on November 8, 2004, and they discussed Golden's desire for "really white" teeth. Golden wanted the whitest veneers Den-Mat produced. Golden showed Dr. Gill the Den-Mat brochure and specifically asked about the durability of the veneers and the potential for discoloration. (Dr. Gill contends she first saw the brochure in April 2007, when Golden complained about the veneers. But the conflict is of no moment on summary judgment because the evidence must be taken favorably to Golden as the party opposing the motions.) Apparently without referring specifically to the Cerinate veneers, Dr. Gill assured Golden that porcelain would not discolor. Dr. Gill recalled telling Golden that the whitest veneers might not be the best choice cos-

metically because they could look artificial rather than natural. But Golden was adamant she wanted the whitest shade.

Dr. Gill removed the old veneers, took impressions of Golden's teeth, and ordered the new veneers from Den-Mat. On January 10, 2005, Dr. Gill attached the Cerinate veneers to Golden's upper teeth. At the end of that visit, Dr. Gill gave Golden a written warranty for the veneers. The document is entitled "Five Year Limited Warranty" and states the Cerinate porcelain is "warranted against defects in workmanship and materials for a period of five (5) years from delivery date." The warranty covers the "repair or replacement" of the veneers but expressly excludes the costs for "removal or reinsertion," any cash refund, and consequential damages such as lost wages or pain and suffering. The warranty card states in small print that it "is in lieu of all other warranties, whether expressed or implied." The warranty card was filled in with Golden's name and address. Dr. Gill signed the card and a certification that the veneers had been applied using Den-Mat's bonding cement and appropriate preparation techniques.

Golden later testified in her deposition that she felt the veneers seemed darker or less white as soon as they had been affixed to her teeth. Nonetheless, Golden returned to Dr. Gill 3 weeks later and had the remaining veneers applied to her lower teeth. By then, one of the upper veneers had come loose and another appeared to have a crack in it. Dr. Gill ordered replacement veneers and later applied them; she did not charge Golden for that work.

Golden paid $9,875.25 for the Cerinate veneers. The payment was made to Dr. Gill. The record on appeal is unclear as to whether Golden made a single payment or paid a portion of the cost as a deposit. The record does not indicate when Golden tendered any payments. Neither a bill nor an invoice has been included among the evidentiary materials.

Another veneer came off about 6 months later. Dr. Gill reapplied the veneer, again at no cost to Golden. In late March 2007, another veneer came off. Dr. Gill ordered a replacement veneer from Den-Mat. The replacement veneer was considerably whiter than the veneers Golden already had. On April 23, 2007, Dr. Gill spoke with a Den-Mat representative who said it was possible that

Golden's veneers had become stained or had darkened over time. Dr. Gill recounted the conversation to Golden the same day.

Later on April 23, 2007, Golden wrote a letter to Dr. Gill expressing her dissatisfaction with the veneers and her belief they had developed "a gray cast" in the 15 months since they were placed on her teeth. Golden asked for Dr. Gill's help in obtaining a new set of veneers from Den-Mat at no cost. Dr. Gill's staff noted the letter in her office chart a week later. Den-Mat declined to replace Golden's veneers.

In the first part of 2008, Golden went to her regular dentist to have the Cerinate veneers removed from her upper teeth and replaced with a similar product from another manufacturer. The replacements cost about $4,500. In the summary judgment materials, Golden submitted a close-up photograph of her teeth after the upper veneers had been replaced. In the photograph, the lower teeth, with the Cerinate veneers, are noticeably duller than the replacement veneers and seem to have what could be stains.

On January 9, 2008, Golden filed a petition against the Den-Mat entities and Dr. Gill alleging breach of express warranties regarding the veneers and breach of implied warranties of merchantability and fitness for a particular purpose. She also alleged violations of the KCPA for a deceptive act or practice based on statements regarding the characteristics of the veneers and an unconscionable act or practice based on an attempt to limit the implied warranties in violation of K.S.A. 50-639. Golden alleged the veneers had become stained and discolored and some of them came off or cracked. Den-Mat and Dr. Gill duly filed separate answers denying liability. The parties conducted significant discovery. In the final pretrial order, Golden sought to recover the cost of the Cerinate veneers; the cost of the replacement veneers she got in 2008; and $5,000 for lost time, inconvenience, and pain and suffering. Den-Mat and Dr. Gill filed separate motions for summary judgment with supporting memorandums and exhibits. Golden responded. The district court requested and received additional briefing on issues related to sales under the UCC.

The district court granted summary judgment to the defendants on all of Golden's claims. In a short letter ruling issued on August

17, 2009, without citing supporting statutes or caselaw, the district court found that warranty claims against Den-Mat were torts filed beyond the 2-year statute of limitations. The district court held that the 3-year statute of limitations on the KCPA claims against Den-Mart expired in September 2007. As to Dr. Gill, the district court found the claims to be for professional negligence and, thus, governed by a 2-year statute of limitations that expired before Golden filed suit. The district court ruled that if the claims were brought under the UCC, Golden failed to give timely notice as required under the UCC. The district court found the KCPA inapplicable to Dr. Gill because the transaction was one for professional services rather than goods. And the district court found that the warranty card Dr. Gill gave to Golden did not limit implied warranties of merchantability or fitness for a particular use and did not otherwise violate the KCPA.

Golden has timely appealed. In their briefing to this court, the parties address an array of issues. Both Den-Mat and Dr. Gill reiterate other grounds they advanced in their motions and contend those grounds support summary judgment on the notion the district court may have reached the proper legal result, although not necessarily for the right reasons. See *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 525, 113 P.3d 241 (2005) ("If a trial court reaches the right result, its decision will be upheld even though the trial court relied upon the wrong ground or assigned erroneous reasons for its decision.").

## LEGAL ISSUES
### STANDARDS OF REVIEW

We have alluded to the standards of review on an appeal from summary judgment. They are well settled, and the parties are familiar with them so we outline them only briefly. A party seeking summary judgment has the obligation to show, based on appropriate evidentiary materials, there are no disputed issues of material fact and judgment may, therefore, be entered in its favor as a matter of law. *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009); *Korytkowski v. City of Ottawa*, 283 Kan. 122, Syl. ¶ 1, 152 P.3d 53 (2007). In essence, the movant

argues there is nothing for a jury or a trial judge sitting as factfinder to decide that would make any difference. The party opposing summary judgment must then point to evidence calling into question a material factual representation made in support of the motion. *Shamberg*, 289 Kan. at 900; *Korytkowski*, 283 Kan. 122, Syl. ¶ 1. If the opposing party does so, the motion should be denied so a factfinder may resolve that dispute. In addressing a request for summary judgment, the trial court must view the evidence most favorable to the party opposing the motion and give that party the benefit of every reasonable inference that might be drawn from the evidentiary record. *Shamberg*, 289 Kan. at 900; *Korytkowski*, 283 Kan. 122, Syl. ¶ 1. An appellate court applies the same standards in reviewing the entry of a summary judgment. Because entry of summary judgment amounts to a question of law—it entails the application of legal principles to uncontroverted facts—an appellate court owes no deference to the trial court's decision to grant the motion and review is unlimited. See *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009).

## STATUTES OF LIMITATION AND UCC NOTICE

The defendants asserted and the district court relied on multiple statute of limitations arguments to defeat Golden's claims. The district court recast Golden's statutory claims against both defendants under the UCC and her claims against Dr. Gill under the KCPA as common-law torts and granted summary judgment because, so treated, they were filed outside the governing limitations period. The district court also ruled that the KCPA claims against Den-Mat were filed after the 3-year statute of limitations had run. Both Dr. Gill and Den-Mat additionally argue that Golden failed to give timely notice under the UCC that the veneers failed to perform as warranted and, therefore, those claims should be barred. See K.S.A. 84-2-607(3)(a). While not strictly a statute of limitations, the requirement for timely notice that goods sold fail to conform to the contract creates a condition precedent for bringing suit under Article 2 of the UCC and, thus, would be applicable here. The district court erred in granting summary judgment on

the grounds that Golden's suit was filed after the governing statutes of limitation had expired or that the notice of breach was untimely for UCC purposes.

Before turning to those issues, we settle some procedural skirmishing between Golden and the defendants. Dr. Gill argues that Golden did not assert UCC claims in her petition. And Golden argues the defendants failed to properly preserve their statute of limitations defenses. Neither side presents a convincing procedural bar.

Golden did not specifically cite the UCC in her petition. But a plaintiff is not required to categorize causes of action or cite statutory or common-law bases for the suit. See *Berry v. National Medical Services, Inc.*, 41 Kan. App. 2d. 612, Syl. ¶¶ 1, 2, 205 P.3d 745 (2009), *aff'd on other grounds* 292 Kan. 917, 257 P.3d 287 (2011). A plaintiff must simply set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," coupled with a demand for appropriate relief. K.S.A. 60-208(a). In her petition, Golden alleged misrepresentations about the Cerinate veneers, her reliance on those misrepresentations in purchasing the veneers, and their failure to maintain their appearance. She also characterized the veneers as "goods," the term used to describe items subject to Article 2 of the UCC, citing K.S.A. 84-2-101 *et seq.*; see K.S.A. 84-2-102 (Article 2 applies to "transactions in goods"); K.S.A. 84-2-105(1) (defining goods). She alleged breaches of an express warranty and of warranties of merchantability and fitness for a particular purpose. Those allegations satisfy the notice requirements of an opening pleading. The legal theories may, but need not, be expressly identified in the petition; they can be fleshed out during the discovery process. Here, the UCC claims were plainly included in the final pretrial order. See K.S.A. 60-216. And the parties had full opportunity to address those claims on summary judgment. See *Nelson v. Nelson*, 288 Kan. 570, 584, 205 P.3d 715 (2009). The UCC claims are properly in the case.

Golden contends neither Den-Mat nor Dr. Gill preserved statute of limitations defenses in the pretrial order and Dr. Gill failed to affirmatively plead them in her answer. The record supports Golden's assertion about the omissions. Ordinarily, those failures

would amount to waivers of an affirmative defense. See *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, Syl. ¶ 8, 61 P.3d 68 (2002) (issue omitted from pretrial order generally should not be considered); *Estate of Belden v. Brown County*. 46 Kan. App. 2d 247, 266, 261 P.3d 943 (2011) (failure to plead affirmative defense results in waiver). But Den-Mat and Dr. Gill both presented statute of limitations defenses in their summary judgment motions. Golden responded on the merits without also arguing the defenses had been waived and, therefore, relinquished the procedural challenge to them. See 46 Kan. App. 2d at 266; *Herrington v. Pechin*, 198 Kan. 431, 434, 424 P.2d 624 (1967) (When the proponent argues or offers evidence on an affirmative defense without objection from the opposing party that the defense had not been pled, the court may consider the defense.). As to Dr. Gill, Golden mentioned in passing that the defense had not been stated in the pretrial order but made no argument it has been lost as a result. The statute of limitations defenses are properly in the case.

*District Court Erred in Applying the 2-Year Limitations Period for Torts*

We now turn to the district court's characterization of Golden's assertions against Den-Mat as tort claims and against Dr. Gill as professional negligence claims subject to a 2-year statute of limitations. See K.S.A. 60-513(a)(3), (a)(4), and (a)(7). We are handicapped in trying to discern the district court's rationale because neither the letter ruling nor the journal entry reflecting the rulings contains any detailed explanations for the conclusions. Given the pleadings, the summary judgment briefing, and the pretrial order, we find the district court's approach erroneous. Golden consistently described the wrongful conduct here as misrepresentations about the qualities of the Cerinate veneers—particularly that they would not stain or discolor over time. On the summary judgment record, those purported misrepresentations arguably became part of the basis of the bargain embodied in the sale of the veneers. That sort of conduct potentially gives rise to a range of claims with differing limitations periods. The conduct could be fraudulent, a

tort with a 2-year limitations period. *Osterhaus v. Toth*, 291 Kan. 759, 787-788, 249 P.3d 888 (2011). It may violate the KCPA, a statutory action with a 3-year limitations period under K.S.A. 60-512(2). *Alexander v. Certified Master Builders Corp.*, 268 Kan. 812, 824, 1 P.3d 899 (2000); *Haag v. Dry Basement, Inc.*, 11 Kan. App. 2d 649, 650, 732 P.2d 392, *rev. denied* 241 Kan. 838 (1987). It may amount to common-law breach of contract with either a 3-year or 5-year limitations period depending on whether the agreement was oral or written. See K.S.A. 60-511(1); K.S.A. 60-512(1). It may violate Article 2 of the UCC, which has a 4-year limitations period. K.S.A. 84-2-725(1).

A plaintiff may advance multiple theories of liability based either on a unitary course of conduct by a defendant or on a single legal injury. *Price, Administrator v. Holmes*, 198 Kan. 100, 103-04, 422 P.2d 976 (1967) (plaintiff may plead causes of action in contract and in tort arising from a single transaction); *Marshel Investments, Inc. v. Cohen*, 6 Kan. App. 2d 672, 679-80, 634 P.2d 133 (1981); see, *e.g.*, *Osterhaus*, 291 Kan. at 760-61 (plaintiff brings claims under the KCPA, for fraud, and for breach of contract arising from a single transaction). A plaintiff may assert some available theories but not others. And the plaintiff may pick and choose at his or her discretion so long as the defendant has been fairly apprised of the circumstances. To the extent a defendant cannot determine the theories from the petition, he or she may pursue discovery, including interrogatories, to clarify the legal grounds or request clarification at a pretrial conference.

Golden sought to exercise her prerogative to define the claims she wished to assert. She plainly intended to rely on violations of the KCPA and the UCC based on representations about the veneers and implied warranties either created or protected under those statutory schemes. Golden was not asserting a tort-based products liability claim against Den-Mat, as by arguing the particular veneers she received were manufactured in a substandard way causing her physical harm. Nor was she contending Dr. Gill improperly applied them in a manner falling below standards for appropriate dental practice, a tort claim for professional negligence. Golden says the veneers did not hold up as promised—they stained

and turned grey so she didn't have the really white teeth she requested—and they were unfit for their intended use or purpose.

The district court had no legal basis to recast those claims into torts so they could be dismissed on statute of limitations grounds. On appeal, Den-Mat attempts to justify the district court's treatment of Golden's claims as torts because she listed pain and suffering damages in the pretrial order along with other relief. Recovery for pain and suffering typically is a tort remedy. But the notion that a plaintiff's requested monetary damages define the cause of action rather than the stated cause of action defining the appropriate monetary remedies borders on the nonsensical. If that were so, had Golden requested treble damages, the district court could have treated her claims as alleged violations of federal antitrust laws, 15 U.S.C. § 15 (2006), or the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c) (2006), since they permit such a recovery. And, of course, the petition did not state claims under either of those federal statutory schemes. But the district court would have had no more business dismissing the suit on that basis than it did in declaring the claims to be torts filed past the limitations deadline because Golden asked for pain and suffering damages. The proper approach is to disallow damages inconsistent with a party's stated claim. The district court should have conformed the monetary damages to the claims, not the other way around. In short, the district court erred in dismissing Golden's claims by treating them as torts filed beyond the statute of limitations.

In explaining why the district court erred in transforming Golden's claims from ones under the KCPA and the UCC into common-law torts, we do not decide the scope of legally permissible remedies provided in those statutes. For analytical purposes, we have simply assumed the noneconomic damages Golden has outlined in the pretrial order would be unavailable as a matter of law because that is how Den-Mat sought to explain the district court's ruling. But we also note that Golden has indicated she has abandoned or intends to abandon any claim for pain and suffering. Because we are setting aside the summary judgment and remand-

ing for further proceedings, the parties and the district court will need to resolve the status of the nonecomomic damages.

Dr. Gill tries to bolster the district court's treatment of the claims against her as ones for professional negligence by arguing she was not involved with the sale of the veneers. The argument lacks traction on summary judgment. The record, viewed favorably to Golden, contains evidence enmeshing Dr. Gill in the sale of the Cerinate veneers. Den-Mat referred Golden to Dr. Gill. Dr. Gill actually ordered and received the veneers. Golden paid Dr. Gill rather than Den-Mat for the veneers. The summary judgment record does not indicate that Golden made separate payments for the veneers and for Dr. Gill's services in applying them. Dr. Gill presented Golden with the warranty card. Dr. Gill repaired and replaced individual veneers without any additional charge to Golden. All of those circumstances appear to involve Dr. Gill in the sale, although she offers different explanations for at least some of her conduct. Jurors sort out varied facts and their implications at trial. Summary judgment is not a vehicle for the courts to usurp that duty.

As important at this stage, Golden does not assert Dr. Gill's conduct in applying the veneers was below accepted standards of care for dentists, a claim that would be tort based. She contends Dr. Gill joined in the misrepresentations about how the Cerinate veneers would not stain or darken, thereby inducing her to purchase that particular product to meet her stated desire for an exceptionally white smile. The harm Golden alleges lies in the statements of Den-Mat and of Dr. Gill fostering an inaccurate belief on her part about the attributes of goods in a consumer transaction, not in Dr. Gill's having ineptly performed a dental procedure. Golden has not presented her claims as torts, and nothing requires that they be treated that way. The facts, taken favorably to her, outline warranty claims related to the sale of goods covered under the UCC. Neither defendants nor courts may remake colorable claims of plaintiffs into something they are not so a defense that otherwise could not get off the ground soars to a summary judgment victory.

*Statute of Limitations on UCC Claims and Untimely Notice of Breach*

The UCC contains a 4-year statute of limitations for contract claims based on the sale of goods under Article 2 of the Code. K.S.A. 84-2-725(1) ("An action for breach of contract for sale must be commenced within four years after the cause of action has accrued."). The UCC provides that the cause of action accrues when the breach occurs. The injured party need not know of the breach to trigger the limitations period. K.S.A. 84-2-725(2). Of particular importance here, given the facts, a breach of a contractual warranty under the UCC "occurs when tender of delivery is made." K.S.A. 84-2-725(2). If the warranty includes a promise of future performance of the goods, a breach does not occur until the recipient discovers or should have discovered the deficient performance. K.S.A. 84-2-725(2). Consistent with those statutes, the Kansas Supreme Court has recognized the limitation period for a breach of warranty typically begins running when the goods are delivered or installed. *Atlas Industries, Inc. v. National Cash Register Co.*, 216 Kan. 213, 221, 531 P.2d 41 (1975) (citing *Val Decker Packing Co. v. Corn Products Sales Co.*, 411 F.2d 850, 851 [6th Cir. 1969]). That reflects the general rule. See *RCI Contractors & Engineers v. Joe Rainero Tile*, 677 F. Supp. 2d 914, 917 (W.D. Va. 2010); *Ouellette v. Clinton Lindberg Cadillac Co.*, 60 S.W.3d 618, 621 (Mo. App. 2001).

Here, the veneers were delivered under the contract on January 10, 2005, when Dr. Gill applied them to Golden's upper teeth. The 4-year limitations period began to run then at the earliest. Golden filed suit on January 9, 2008, well within the limitations period in K.S.A. 84-2-725(1), (2). Assuming the UCC otherwise applies to the transaction, an issue we take up later, Golden asserted those claims against Den-Mat and Dr. Gill within the limitations period.

But Den-Mat and Dr. Gill also argued to the district court that Golden failed to provide timely notice that the veneers performed in a way that breached the sales contract and, therefore, her UCC claims should be dismissed as a matter of law. The notice requirement appears in K.S.A. 84-2-607(a)(3). The district court accepted

that argument as an alternative basis for granting summary judgment on the UCC claims. The district court erred in doing so.

As we have indicated, Article 2 of the UCC governs the sale of goods and, thus, essentially reflects a codification of contract principles to be applied to transactions within its scope. See K.S.A. 84-2-101, Kansas Comment 1 (1996); K.S.A. 84-2-102. If the buyer of goods covered under the UCC "discovers or should have discovered" a breach of the contract after accepting the goods, the buyer "must within a reasonable time" notify the seller. K.S.A. 84-2-607(3)(a). A failure to give timely notice, as required in K.S.A. 84-2-607(3)(a), bars the buyer from any remedy. K.S.A. 84-2-607(3)(a). The purpose, in part, is to allow a seller a chance to look into the transaction and correct any deficiency, thereby giving the parties an opportunity to avert potentially expensive, time-consuming litigation. See K.S.A. 84-2-607, Kansas Comment 2 (1996); *Smith v. Stewart*, 233 Kan. 904, 909, 667 P.2d 358 (1983). The notification also permits the seller to prepare for negotiation or litigation, as by gathering and preserving documents and other evidentiary materials relevant to the transaction. 233 Kan. at 909.

Den-Mat and Dr. Gill argued that Golden failed to give timely notice of the problems with the veneers. They point to the letter Golden sent to Dr. Gill in late April 2007 as the first notification she was dissatisfied with the veneers and believed the sales contract had been breached. Assuming the letter to be the first notice of potential breach, Golden made her position known about 27 months after the veneers were delivered and applied and some 20 months before the UCC limitations period would have expired. Neither Den-Mat nor Dr. Gill suggests the delay compromised any defenses they might have had to the suit or otherwise resulted in the loss of evidence. They do not claim they might have been able to negotiate a resolution without litigation had Golden given notice sooner—suit was not filed for another 8 months after Dr. Gill received the letter.

Basically, Den-Mat and Dr. Gill contend Golden's 27-month delay in giving notice was unreasonable as a matter of law under K.S.A. 84-2-607(3)(a). The district court apparently accepted that rationale. We do not. The statute requires notice within "a reason-

able time." In turn, the UCC expressly recognizes that a reasonable time for acting "depends on the nature, purpose and circumstances" of the required or contemplated action. K.S.A. 84-1-204(2). The Kansas Comment to K.S.A. 84-2-607 points out that the courts do not apply the notice-of-breach obligation as stringently in cases involving consumers as in those between commercial entities. And, according to the Comment, a relaxed notice requirement is particularly appropriate when the consumer-buyer's delay neither prevented remediation of the breach nor prejudiced the seller in defending against the suit. K.S.A. 84-2-607, Kansas Comment 2 (1996).

The Kansas Supreme Court took that approach in *Smith*, recognizing that the reasonableness of the notice from a consumer-buyer under K.S.A. 84-2-607(3)(a) should be assessed "[u]nder the totality of the circumstances" rather than with "blind adherence to the generally appropriate 'condition precedent' concept," especially when any claimed delay compromised none of the purposes to be furthered through timely notification. See *Smith*, 233 Kan. at 914. The court pointed out that the notice requirement aims " 'to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.' " 233 Kan. at 914 (quoting Official UCC Comment 4 to K.S.A. 84-2-607). Other courts have taken the same view. *Wal-Mart v. Wheeler*, 262 Ga. App. 607, 611, 586 S.E.2d 83 (2003); *Fitl v. Strek*, 269 Neb. 51, 54-56, 690 N.W.2d 605 (2005) (2-year delay in giving notice of breach after consumer sale not unreasonable under Nebraska UCC 2-607); *Maybank v. Kresge Co.*, 302 N.C. 129, 135-36, 273 S.E.2d 681 (1981) (3-year delay by consumer in giving notice of breach in sale of goods under UCC is not unreasonable as a matter of law on facts presented); see *Hays v. General Elec. Co.*, 151 F. Supp. 2d 1001, 1012-13 (N.D. Ill. 2001) (In a case between commercial entities, the court recognizes that timeliness of notification under UCC 2-607 typically presents a jury question, especially if the buyer communicates before filing suit and without causing demonstrable prejudice to the seller.).

The circumstances here preclude a finding as a matter of law that Golden's letter amounted to untimely notice under K.S.A. 84-2-607(3)(a). Given Golden's status as a consumer and the lack of

claimed prejudice from Den-Mat and Dr. Gill, the timeliness of the notice is a matter of fair debate and, hence, a question for the jury. The courts commonly consider determinations of reasonable time under 2-607(3)(a) and under the UCC generally to be within the province of the factfinder. *La Villa Fair v. Lewis Carpet Mills, Inc.*, 219 Kan. 395, 401-03, 548 P.2d 825 (1976) (rejection of goods within reasonable time under K.S.A. 84-2-602(1) question for factfinder); *Inter-Americas Ins. Corp. v. Imaging Solutions Co.*, 39 Kan. App. 2d 875,885-86, 185 P.3d 963 (2008) (reasonable time under UCC "usually a question of fact for the jury"); see *Sherkate Sahami Khass Rapol v. Henry R. Jahn & Son*, 701 F.2d 1049, 1051 (2d Cir. 1983) (rejection of goods under New York UCC 2-602); *Hays*, 151 F. Supp. 2d at 1012-13 (notice under Illinois version of UCC 2-607); *Fitl*, 269 Neb. at 54-56 (notice under Nebraska version of UCC 2-607). This is such a case. Whether Golden provided notice of breach within a reasonable time under K.S.A. 84-2-607(3)(a) should have been left for the jury.

*Statute of Limitations on KCPA Claims*

The district court also found that the KCPA claims against Den-Mat were barred by a 3-year statute of limitations period. See K.S.A. 60-512(2). In the letter ruling, the district court indicated it was "persuaded by Den-Mat" that any such claims should have been filed no later than September 2007. The summary judgment papers present an argument that Golden's KCPA claims arose when she received the brochure from Den-Mat, but the date is nowhere established in the memoranda. Given the chronology of events, we can safely conclude that Golden received the brochure before Dr. Gill applied the veneers on January 10, 2005, and probably before their first consultation on November 8, 2004. Even within that time frame, however, we conclude the district court erred in dismissing the KCPA claims on limitations grounds.

As outlined in the final pretrial order, Golden makes a couple of claims under the KCPA. First, she contends representations the Cerinate veneers would not stain or darken and about their overall durability induced her to purchase them. She says those representations amounted to a deceptive act or practice that violated the

KCPA, see K.S.A. 50-626. Second, she contends the written limited warranty she received violated the KCPA by diluting implied warranties under the UCC. See K.S.A. 50-639 (prohibiting limitation of implied UCC warranties and providing remedy for such limitation). She also characterizes the dilution of the warranties as an unconscionable act or practice independently violating K.S.A. 50-627.

Den-Mat's limitations argument for dismissing the KCPA violation for diminution of the UCC warranties may be disposed of quickly. Golden received the written warranty that purported to exclude all other implied or express warranties on January 10, 2005. So any violation arose then. Golden filed her petition on January 9, 2008. That is within the 3-year limitations period for KCPA claims, albeit with no time to spare.

The KCPA aims to protect consumers from unscrupulous business practices and, as remedial legislation, should be read liberally to further that objective. See K.S.A. 50-623; *Moore v. Bird Engineering Co.*, 273 Kan. 2, Syl. ¶ 3, 41 P.3d 755 (2002); *Stair v. Gaylord*, 232 Kan. 765, 775, 659 P.2d 178 (1983) (KCPA should be liberally construed to protect consumers from deceptive or unconscionable practices and from unilateral warranty disclaimers). The KCPA prohibits deceptive acts and practices "in connection with a consumer transaction," as described in K.S.A. 50-626. In turn, a "consumer transaction" has been broadly defined under the KCPA to mean "a sale . . . or other disposition for value of property or services . . . or a solicitation by a supplier with respect to any of these dispositions." K.S.A. 50-624(c).

Den-Mat argues the alleged KCPA violation occurred when Golden received the brochure containing the statements she describes as deceptive. That happened more than 3 years before she filed her suit. Broadly reading the statutory language, a supplier might violate the KCPA by making a false or deceptive representation in an advertisement such as the brochure because that would be a solicitation for a sale and, thus, a consumer transaction within the meaning of the Act. And it would be such a transaction even if nothing more happened. So Den-Mat arguably violated the KCPA with the delivery of the brochure to Golden. The Kansas

attorney general or the Sedgwick County district attorney might have been able to move against Den-Mat at that point to cut off any further dissemination of deceptive advertising. See *Finstad v. Washburn University*, 252 Kan. 465, 472-73, 845 P.2d 685 (1993) (K.S.A. 50-632 gives the attorney general and county or district attorneys authority to bring a KCPA enforcement action even though no "loss or injury result[s] from a violation."). But the Kansas Supreme Court has construed the KCPA to require that a consumer must be "aggrieved" by a violation and "suffer[ an injury or] loss as the result of the publication" of an advertisement or other deceptive statement to create a private cause of action. *Finstad*, 252 Kan. at 471-72. A statute of limitations cannot begin to run absent circumstances arguably satisfying the legal requirements for a claim. Based on *Finstad*, Golden had no claim when she received the brochure or first met with Dr. Gill, since she had suffered no loss. The limitations clock could not have started ticking at that point, contrary to Den-Mat's argument. Golden would not have suffered a loss until she paid for *and* received the object of the consumer transaction.

Even if delivering the brochure did amount to *a* violation, that is not *the* violation Golden has alleged or sued upon. *Golden has based her claims on the sale of the Cerinate veneers—a sale is a covered consumer transaction under the KCPA*. Golden contends she entered into the sale based in no small part on the representations in the brochure. Those representations, therefore, were made "in connection with" the sale and, if deceptive, would taint the sale in violation of the KCPA. See *Campbell v. Hubbard*, 41 Kan. App. 2d 1, 7, 201 P.3d 702 ("[T]he time limit for bringing a claim under the KCPA begins when the KCPA violation occurs."), *rev. denied* 286 Kan. 1176 (2008). The sale plainly did not occur when Golden received the brochure. For purposes of the KCPA, the sale took place no earlier than the delivery of the veneers to Golden—when Dr. Gill applied them to Golden's teeth on January 10, 2005.

The KCPA does not define "sale." In many consumer transactions, though by no means all of them, the buyer and seller exchange payment for goods simultaneously. The exchange marks

a sale. Even if the buyer and seller had earlier agreed to the terms of the transaction, that would not be a sale but a bilateral contract for sale—a promise of an agreed payment in exchange for a promise to deliver described goods. The swap or performance of the contract creates the sale. When the consumer pays before delivery, the sale takes place when the seller delivers the goods or performs his or her promise. That is consistent with the meaning of "sale" under the UCC. K.S.A. 84-2-106(1) (sale "consists in the passing of title from the seller to the buyer for a price, as outlined in K.S.A. 84-2-401); K.S.A. 84-2-401(2) ("Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods."). Given the cross-pollination of the KCPA and the UCC, see, *e.g.*, K.S.A. 50-624, Kansas Comment 3 (1973); K.S.A. 50-627, Kansas Comment 1 (1973); K.S.A. 50-639, Kansas Comment 1 (1973) (all citing and incorporating UCC concepts, definitions, and statutory provisions), use of the UCC definition makes sense for transactions that do not involve goods for which written documents of title typically exist.

We conclude that the sale of the veneers, the consumer transaction Golden contends entailed a deceptive act violating K.S.A. 50-626, took place no earlier than January 10, 2005, and the statute of limitations period for her KCPA claim began to run no sooner. Arguably for KCPA purposes, the sale was not completed until Golden received delivery of the last of the veneers in late January 2005. We need not and do not consider that possibility, since the action was otherwise timely. Accordingly, Golden filed suit within the 3-year limitations period for her claim based on the deceptive sale of the veneers.

We do not mean to suggest that a consumer entering into a contract based on the seller's deceptive practices and making full or partial payment before delivery would have no KCPA claim at that stage. A deceptive practice by the seller inducing the payment would be made "in connection with a consumer transaction"—the sale—and, thus, a violation of K.S.A. 50-626(a), although the sale had not been completed. The consumer would have sustained a financial loss necessary for a private cause of action. But those

circumstances are not the circumstances of this case, as outlined in the summary judgment record, because Golden relies on the sale itself. Nothing in the language of the KCPA suggests a buyer would have to await the completion of a covered transaction to have a legally viable claim for a deceptive act. Consistent with a broad or liberal construction of the KCPA furthering its purposes, a buyer could have KCPA claims both upon making payment and upon completion of the sale, if those occurred at different times.

Dr. Gill made no argument to the district court that the 3-year limitations period under the KCPA barred Golden's claims. And she does not attempt to do so on appeal. As we have noted, Dr. Gill argued that the claims should have been treated as ones for negligence and, thus, subject to a 2-year statute of limitations. We have found that argument unpersuasive.

The district court erred in relying on any of the statute of limitations grounds and on untimely notice of breach under the UCC to grant summary judgment to Den-Mat and Dr. Gill.

## APPLICATION OF UCC

Dr. Gill has fired a veritable broadside at the substance of the UCC claims Golden has asserted. Despite the numerous arguments Dr. Gill asserts, we do not find any that would support summary judgment on the factual record in this case. We address the points sequentially.

### UCC Coverage

Dr. Gill contends there was "no transaction in goods" between her and Golden and, therefore, the UCC does not apply. Beneath that overstatement of the circumstances lurks an actual controversy that should be left for the jury. As we have said, Article 2 of the UCC regulates the sale of goods. The UCC defines goods expansively as meaning "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale," except for the money to be paid under the contract for the goods, investment securities, and legal rights to things or property. K.S.A. 84-2-105(1).

Goods—the Cerinate veneers—were plainly involved in and integral to the transaction involving Golden and Dr. Gill, as we have already indicated. Golden met with Dr. Gill, as Den-Mat's recommended dentist, and ordered the veneers through her. Dr. Gill received the veneers and then applied them to Golden's teeth. Golden paid Dr. Gill. But a sale does not come within the scope of the UCC merely because the contract *includes* the transfer of goods. Many contracts also entail services associated with the goods. The arrangement here was of that sort, and Dr. Gill provided services essential for Golden's use of the veneers. In UCC parlance, those transactions involving goods and services are commonly known as mixed or hybrid contracts.

The UCC does not address mixed contracts as such. So courts have created common-law rules to determine if those transactions should be treated as sales of goods covered under the UCC or service contracts outside the Code's regulation. Some 30 years ago, the Kansas Supreme Court adopted the "predominant purpose" test for classifying mixed contracts. *Care Display, Inc. v. Didde-Glaser, Inc.*, 225 Kan. 232, 238-39, 589 P.2d 599 (1979). The predominant purpose test has become the commonly accepted, if not the near universal, standard. See 1 White & Summers, Uniform Commercial Code, ch. 9, § 9-2, p. 606 (5th ed. 2006). As the name suggests, the test attempts to discern the principal nature of the transaction: Is the buyer seeking services to which the goods are incidental, or is the buyer acquiring goods to which the services are auxiliary? *Care Display*, 225 Kan. at 238 (" 'The test for inclusion or exclusion [of mixed contracts under the UCC] is . . . whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved . . . or is a transaction of sale, with labor incidentally involved.' " [quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 [8th Cir. 1974]). The *Bonebrake* case, on which *Care Display* relied, has come to be viewed as the archetypal statement of the predominant purpose test, see *Hensley v. Ray's Motor Co. of Forest City, Inc.*, 158 N.C. App. 261, 265, 580 S.E.2d 721 (2003); 1 White & Summers, Uniform Commercial Code, ch. 9, § 9-2, p. 606. Thus, Kansas fits comfortably within the mainstream in applying the UCC to

contracts in which goods reflect the focus or predominant purpose of the bargain.

The predominant purpose test, however, is not especially predictive in the abstract. It looks at and depends upon the factual circumstances of the transaction being litigated. *Care Display*, 225 Kan. at 238 ("[E]ach case must be determined on an individual basis[,] and . . . broad statements of principles are of little assistance in deciding a particular [case]."). The Kansas appellate courts have developed some general considerations in looking at mixed contracts. Apart from *Care Display*, involving a contract for creative design and production of a promotional program and exhibit for a national trade show, the Kansas cases have dealt with sales of computer software and related services. All of them have reaffirmed the predominant purpose test. See, *e.g.*, *Wachter Management Co. v. Dexter & Chaney, Inc.*, 282 Kan. 365, 369, 144 P.3d 747 (2006); *Inter-Americas Ins. Corp. v. Imaging Solutions Co.*, 39 Kan. App. 2d 875, 885, 185 P.3d 963 (2008); *System Design v. Kansas City P.O. Employees Credit Union*, 14 Kan. App. 2d 266, 270-71, 788 P.2d 878 (1990).

In that context, the Kansas Supreme Court recognized that the UCC should be applied if the services would have been unnecessary without the purchase of the software. *Wachter Management*, 282 Kan. at 369. Reiterating the need to look at each contract individually under the predominant purpose test, this court held that the sale of a commercial off-the-shelf software program was covered under the UCC, even though the seller also provided installation and training services as part of the contract. *System Design*, 14 Kan. App. 2d at 272. The court noted divided case authority from other jurisdictions on contracts for custom designed software. Some decisions hold those to be contracts primarily for goods, the software itself, covered under the UCC, but others hold them to be primarily for the design services in creating the programs and, thus, outside the UCC. 14 Kan. App. 2d at 271-72. In *Care Display*, the Kansas Supreme Court found the contract to be predominately for the creative services in developing the themes and substantive content for the sales presentation rather than for the materials used to construct the physical exhibit. 232 Kan. at

239. We have uncovered no more apt Kansas appellate authority. And we have discovered no cases from any other jurisdiction addressing transactions involving dental veneers. Dr. Gill cites two comparatively old cases involving contracts for the manufacture and fitting of dentures that do not consider or apply the predominant purpose test. See *Carroll v. Grabavoy*, 77 Ill. App. 3d 895, 396 N.E.2d 836 (1979); *Preston v. Thompson*, 53 N.C. App. 290, 280 S.E.2d 780 (1981). As we discuss later, those cases are distinguishable and, ultimately, unpersuasive.

Courts have split over whether the predominant purpose of a mixed contract presents an issue of law for the court or a question of fact for the jury. See *Higgins v. Lauritzen*, 209 Mich. App. 266, 269-70, 530 N.W.2d 171 (1995) (question of fact); *Valley Farmers' Elevator v. Lindsay Bros.*, 398 N.W.2d 553, 556 (Minn. 1987) (generally question of law), *overruled on other grounds Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn. 1990); *MBH, Inc. v. John Otte Oil & Propane*, 15 Neb. App. 341, 348, 727 N.W.2d 238 (2007) ("whether goods or nongoods predominate a contract is generally a question of law"); *Quality Roofing v. Hoffmann-La Roche*, 302 N.J. Super. 163, 166, 649 A.2d 1077 (1997) (question of fact). The Kansas appellate courts apparently have not directly addressed the point.

The Nebraska Court of Appeals suggested the issue should be treated as a matter of law because contract interpretation commonly presents legal rather than factual determinations. *MBH, Inc.*, 15 Neb. App. at 348. That is true when the language of a written contract is unambiguous. But determining whether goods or services predominate in a mixed contract necessarily looks beyond the contractual language. It includes the reasons the buyer purchases the goods and the nature and extent of the integration of those goods with the related services. It likely requires detailed information about the goods and the services over and above what may be described in the contract. Given the case-specific inquiry and the factually driven nature of the determination, essentially considering all of the circumstances bearing on the transaction, we conclude the issue of predominance of goods or services in a mixed contract is fundamentally one of fact. As such, it typically should

be left for the trier of fact rather than resolved on summary judgment.

But, of course, a court may decide an issue of fact if the material circumstances are undisputed in a given case. Absent a factual dispute, the question presented effectively becomes one of law. See, e.g., *St. Clair v. Denny*, 245 Kan. 414, 417, 781 P.2d 1043 (1989); *Lay v. Kansas Dept. of Transportation*, 23 Kan. App. 2d 211, 215, 928 P.2d 920 (1996), *rev. denied* 261 Kan. 1085 (1997). By the same token, even if the predominate purpose of a mixed contract were a question of law, any conflicts in the material historical facts would have to be resolved at trial with the jury providing answers to special interrogatories to inform the court's legal determination. See *Grosshans & Petersen, Inc. v. Givens*, 191 Kan. 650, 652, 383 P.2d 959 (1963) (explaining bifurcation of functions of judge and jury in determining existence of a partnership: what constitutes a partnership is a question of law for the court, but resolution of conflicting facts relevant to the nature of the business relationship is for the jury).

Having concluded the predominant purpose of a mixed contract to be a question of fact, we turn to whether the transaction here, nonetheless, must be considered one principally for services rather than goods based on the summary judgment record. If so, the UCC would be inapplicable, as Dr. Gill argues.

Unlike most medical or dental procedures, Golden's acquisition of the veneers was purely for cosmetic purposes. She was not seeking treatment for some illness or injury. The transaction was materially different from, for example, a dentist filling a cavity. In that instance, the patient or buyer has a malady, perhaps a painful one, and seeks a cure from the dentist. The dentist may drill and fill the cavity, though there might be other treatment options, such as installing a crown or pulling the offending tooth. The patient has received services in the form of a diagnosis, a recommended course of care, and actual treatment. The patient has also received whatever material the dentist used to fill the cavity. The filling itself would likely be a form of goods under the UCC, and the contract between the patient and dentist would be a mixed one. But the services would plainly seem to predominate. The patient wanted

treatment for the cavity and principally sought diagnostic and therapeutic services from the dentist to accomplish that purpose. The patient had no particular interest in what the dentist used to fill the cavity and likely left the decision to the dentist's professional judgment. We think that would be true of the vast majority of transactions between a patient and a healthcare provider for treatment of illness or injury in which there were a single contract.

Golden, however, suffered from no malady and sought no professional diagnosis or treatment. She simply wanted whiter teeth and sought replacements for the veneers she had been wearing. Golden had received information from Den-Mat containing representations about the characteristics of its Cerinate veneers making them appear to be a satisfactory choice. Although disputed in the record, there is evidence Golden shared that information with Dr. Gill and received some assurance from her as to the accuracy of a critical characteristic—the veneers, being made of porcelain, would not stain or dull over time. Golden then purchased Den-Mat's Cerinate veneers through Dr. Gill, who applied them to Golden's teeth.

Viewing the record favorably to Golden, as we must in considering her opposition to summary judgment, she did not go to Dr. Gill with a problem—dull or aesthetically unappealing teeth—for which she wanted a professional consultation about various corrective options. Golden wanted Cerinate veneers and understood from Den-Mat that Dr. Gill could provide and apply that product. To be sure, Dr. Gill also provided services in that she removed the existing veneers, sized and ordered the Cerinate veneers, and applied the new veneers to Golden's teeth. But a jury could fairly conclude Golden wanted the veneers, while the services were simply part of the means of accomplishing that purpose. That would be consistent with the notion that but for the buyer's acquisition of the goods, the services would have been unnecessary, making the contract predominately one for the goods, as the Kansas Supreme Court has suggested. *Wachter Management*, 282 Kan. at 369.

The predominance of the veneers as goods also seems plausible and, thus, within a jury's reasonable consideration when the trans-

action is compared with orthodontics, another form of dentistry often used for largely cosmetic purposes. To straighten the patient's teeth, the orthodontist applies braces and other devices, often over an extended time period. The goods, those devices, are an integral part of the process. But the orthodontist makes a professional judgment about the types of braces to achieve the ultimate purpose of realigning the patient's teeth. Again, the contract is a mixed one for goods and services. But the patient's purpose is not the acquisition of braces but of straight teeth. The braces are temporary appliances, used by the orthodontist, for achieving that end. In those circumstances, the orthodontist's services would seem to predominate over the goods.

The same degree of professional skill and judgment is lacking here in that Golden essentially selected the goods independently, though she sought affirmation of that selection from both Dr. Gill and representatives of Den-Mat regarding particular characteristics of the goods. And, unlike braces, the veneers themselves, once applied, provided the desired cosmetic result. The result continued only so long as the veneers remained in place and performed as Golden understood they would.

Finally, nothing in the record evidence shows Dr. Gill contracted separately with Golden for professional services apart from the purchase of the veneers. The parties do not argue there were separate or distinct contracts for the veneers, on the one hand, and Dr. Gill's services, on the other. The transaction was unitary, combining goods and services. Likewise, there is no evidence Golden was charged separately for the veneers and for Dr. Gill's services or that the services were even broken out as a distinct component or cost in the contract or in any billing. See 1 White & Summers, Uniform Commercial Code, ch. 9, § 9-2, p. 606 (relative costs of goods and services and undifferentiated or itemized billing of them frequently considered in assessing predominant purpose of mixed contract); *Van Sistine v. Tollard*, 95 Wis. 2d 678, 685, 291 N.W.2d 636 (1980) (contract primarily for services where property owner supplied some of the siding to be installed on home and installer's labor costs exceeded cost of siding and other materials installer provided).

Dr. Gill presents the *Carroll* and *Preston* decisions, the sale-of-denture cases, as requiring summary judgment in her favor. We disagree.

In *Carroll*, decided more than 30 years ago, the plaintiff purchased a set of full dentures from a dentist who manufactured and fit them. Carroll claimed the dentist promised the dentures would fit properly. The dentist denied making that sort of guarantee. Carroll sued for her money back because the dentures did not fit and irritated her mouth. She alleged violations of express and implied warranties under the UCC. The Illinois Court of Appeals held the UCC inapplicable because the dentist was not selling the dentures but providing skill and knowledge in making and fitting the dentures. 77 Ill. App. 3d at 898-99. The court's characterization of the transaction seems to be something of a legal fiction and certainly more metaphysical than practical. The court did not analyze the transaction under the predominant purpose test for UCC coverage as the Kansas courts would have done even then. The Illinois courts have since applied that test to mixed contracts. See, *e.g.*, *Dealer Management Sys. v. Design Automotive*, 355 Ill. App. 3d 416, 421-22, 822 N.E.2d 556 (2005).

The *Preston* case fits the same fact pattern as *Carroll*: the plaintiff sued a dentist who manufactured and supplied her with a set of full dentures because they fit poorly, contrary to what she said the dentist promised her. The North Carolina Court of Appeals affirmed summary judgment for the dentist. 53 N.C. App. at 296-97. The court found the claim barred under a state statute prohibiting suits against health care providers, including dentists, based on warranties or assurances as to any treatment unless memorialized in writing. Preston claimed no such writing. 53 N.C. App. at 292, 294.

The *Preston* court also analyzed the suit as one for breach of warranty under the UCC and found that claim would not lie, in part, because the dentist provided both goods (the dentures) and services (the manufacture and fitting of the dentures). The court opined the UCC applies only to merchants paid for products alone, while physicians and other health care providers offered professional services and skill. 53 N.C. App. at 295. The court cited *Car-*

*roll* as supporting authority for the proposition the sale of dentures did not come within the scope of Article 2 of the UCC and concluded the Code should not apply because "plaintiff paid for and received a course of health care treatment and services, not merely a piece of merchandise." 53 N.C. App. at 296-97.

Apart from the UCC analysis likely being dicta in *Preston*, the court did not consider or apply the predominant purpose test to the transaction. Rather, the court found the combination of goods and services sufficient in and of itself to remove the contract from the UCC. 53 N.C. App. at 296-97. That alone is inconsistent with Kansas law and renders *Preston*, like *Carroll*, inapposite. North Carolina did not formally recognize the predominant purpose test for another 20 years. See *Hensley*, 158 N.C. App. at 265-66.

In short, the record evidence fails to support a finding as a matter of law for Dr. Gill that the transaction with Golden was one in which acquisition and use of services predominated over the purchase of goods so that the UCC would not apply. Summary judgment could not be granted to Dr. Gill on the UCC claims on that basis or on any KCPA claims dependent upon an exclusion or dilution of otherwise applicable UCC warranties.

*Express Warranty*

Dr. Gill contends that even if the UCC applies in this case, she made no express warranty to Golden about the veneers and could not breach any such warranty. The Kansas courts treat the creation and breach of warranties in transactions for goods as questions of fact. *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009) (breach of implied warranty of merchantability question of fact); *Stair v. Gaylord*, 232 Kan. 765, 770, 659 P.2d 178 (1983) (whether seller breached express warranty may be taken from the jury only if there is no evidence supporting the claim); *Black v. Don Schmid Motor, Inc.*, 232 Kan. 458, 467, 470, 657 P.2d 517 (1983) (breach of implied warranty of merchantability properly submitted to jury whether dealer extended express warranty to buyer is question for jury); *Christopher & Son v. Kansas Paint & Color Co.*, 215 Kan. 185, 197, 523 P.2d 709 (1974) (breach of implied warranty of fitness for particular purpose for jury); *Young & Cooper, Inc. v. Vest-*

*ring,* 214 Kan. 311, 325-27, 521 P.2d 281 (1974); see *Transamerica Oil, Corp. v. Lynes, Inc.,* 723 F.2d 758, 762 (10th Cir. 1983) (applying Kansas law). To prevail at the summary judgment stage, Dr. Gill would have to demonstrate the absence of any facts supporting Golden's legal position.

Under K.S.A. 84-2-313(1)(a), an express warranty entails "any affirmation of fact or promise" a seller makes to a buyer related to the goods that "becomes part of the basis of the bargain." See *Young & Cooper,* 214 Kan. 311, Syl. ¶ 1. The seller need not label the representations as guarantees, warranties, or the like or even intend to create such an affirmation. K.S.A. 84-2-313(2); *Young & Cooper,* 214 Kan. 311, Syl. ¶ 3. A seller's oral representation may constitute an express warranty. *Young & Cooper,* 214 Kan. 311, Syl. ¶ 4 ("representations of fact made in the course of negotiations . . . are warranties"); see *Transamerica Oil,* 723 F.2d at 762. And statements in advertising brochures or other promotional materials may create express warranties. 723 F.2d at 762. To be warranties, the statements must be of a factual nature about the characteristics or utility of the goods. *Young & Cooper,* 214 Kan. 311, Syl. ¶ 4. Mere opinions or general, though unquantifiable, expressions of quality or superiority cannot form the basis of an express warranty. 214 Kan. 311, Syl. ¶ 4. A seller's representations that goods are "first rate" or "the finest around" are examples of sales talk or puffing that would not create an express warranty. See *Malul v. Capital Cabinets, Inc.,* 191 Misc. 2d 399, 402-03, 740 N.Y.S.2d 828 (2002) (statement that kitchen cabinets were built to "last a lifetime" amounted to puffing, not express warranty). An express warranty once created generally cannot then be limited because, by definition, it has become part of the agreed-upon contract or bargain. *Young & Cooper,* 214 Kan. at 324; see *Transamerican Oil,* 723 F.2d at 762; see also *Christopher & Son,* 215 Kan. at 191-92 (UCC warranties cannot be limited through a seller's statements made after the formation of the sales contract). The limited written warranty Dr. Gill gave Golden on January 10, 2005, after applying the upper veneers, cannot negate any express warranty created through the earlier affirmations about the veneers. When Golden received the written warranty, the sale contract had already been

finalized and at least partly performed, so the terms of the written warranty would not modify the contractual agreement.

The summary judgment record contains sufficient evidence, albeit disputed in material particulars, that Dr. Gill made an express warranty to Golden. Golden testified that she showed Den-Mat's brochure to Dr. Gill and discussed at least some of the contents with her. According to Golden, Dr. Gill assured her that porcelain, the substance used in the veneers, would not discolor. Those discussions took place before the sale was finalized. Dr. Gill's statement, if made, was sufficiently factual that a jury could find it to be a warranty. And a jury could conclude Dr. Gill essentially endorsed or affirmed the representations in the Den-Mat brochure. The brochure's statements about the durability and immutable appearance of the Cerinate veneers could be construed as an express warranty, especially because they were tied to the clinical studies supposedly corroborating the affirmations. A jury, therefore, could reasonably find that Dr. Gill did make representations rising to the level of an express warranty. The summary judgment record also suggests a jury could find otherwise. But that means a jury ought to be making the call.

The circumstances here are roughly analogous to those regarding the express warranty in *Black*, 232 Kan. at 469-70. In that case, Black bought a Peugeot from Don Schmid Motors that had been used by a representative of the automobile manufacturer. The sales agent for Don Schmid Motors told Black the vehicle would come with a new car warranty, and the purchase order, signed by a Don Schmid Motors manager, so stated. The Peugeot turned out to be a lemon. After numerous unsuccessful attempts to have problems with the car fixed, Black alleged Don Schmid Motors breached the new car warranty—an express warranty. Don Schmid Motors defended that claim on the grounds that the express warranty came from Peugeot, as the manufacturer, and not from it. But the Kansas Supreme Court held the evidence sufficient for a jury to reasonably conclude Don Schmid Motors was bound by the warranty. 232 Kan. at 470.

Golden's evidence has Dr. Gill reviewing the brochure from Den-Mat before finalizing the sale of the veneers and telling

Golden that porcelain dental appliances won't stain or discolor. That course of conduct is comparable to the communication between Black and Don Schmid Motors regarding the warranty. In that case, the warranty terms were briefly noted in writing. But the notation was silent about who would honor the warranty. The absence of a writing in this case goes to the weight of the evidence, something the jury considers, rather than the legal sufficiency of the evidence in its uncontradicted state as the court must view it on summary judgment.

Dr. Gill also submits Golden has presented no "objective evidence" the Cerinate veneers discolored or stained. But nothing requires so-called objective evidence to establish a submissible breach of warranty claim. Golden says the veneers became stained and dull. That's enough to get to the jury. Testimony need not come from a disinterested witness to demonstrate breach. Again, what the jurors may make of Golden's testimony is for them to decide—not for the court to conjecture as a matter of law. Golden, of course, may call witnesses who will corroborate deterioration of the veneers' appearance.

Dr. Gill argues a claim for breach of the express warranty does not lie at least as to chipping and cracking of the veneers because she replaced them. But that misses the point of the express warranty claim. Golden contends Den-Mat and Dr. Gill represented to her that the veneers would not chip or crack. But they did. If the affirmation created an express warranty, the failure of the veneers to perform to the described level constituted a breach. Dr. Gill's efforts to repair or replace the veneers go to the harm the breach caused and the scope of remedy that might be appropriate for Golden now.

## Implied Warranties

Dr. Gill contends that the evidence taken favorably to Golden fails to establish either a breach of an implied warranty of merchantability under K.S.A. 84-2-314 or a breach of an implied warranty of fitness for a particular purpose under K.S.A. 84-2-315. In turn, the district court would have been correct to enter summary judgment on those grounds, according to Dr. Gill. As we have

noted, the scope and breach of those implied UCC warranties typically present questions for the jury.

An implied warranty of merchantability essentially requires that goods sold by a merchant satisfy basic standards of quality or acceptability. See K.S.A. 84-2-314, Official UCC Comment 2. As outlined in the pretrial order, Golden specifically claims the veneers fell short of the implied warranty requirement they be "fit for the ordinary purpose for which such goods are used." K.S.A. 84-2-314(2)(c). Based on that warranty, a buyer may reasonably expect an item to be something more than "worthless," though not "the finest of all possible goods of that kind." *Black*, 232 Kan. at 467. As in *Black*, the purchaser of a used car from a dealer reasonably may expect the vehicle to "provide dependable transportation." 232 Kan. at 467; see *Dale v. King Lincoln-Mercury, Inc.*, 234 Kan. 840, 843, 676 P.2d 744 (1984) (Consistent with an implied warranty of merchantability, the buyer of a used, low-mileage sedan represented to be in excellent condition may expect the vehicle to "contain a motor and transmission which will give . . . more than a few days' service."). As one court recently stated, a UCC warranty of merchantability " 'does not impose a general requirement that goods precisely fulfill the expectation of the buyer,' " but " 'it provides for a minimum level of quality.' " *Green v. Green Mountain Coffee Roasters, Inc.*, No. 11-2067 (SDW) (MCA), 2011 WL 6372617, at *6 (D.N.J. 2011) (unpublished opinion).

The seller's obligation under an implied warranty of merchantability "depends upon the circumstances of the transaction." *Hodges*, 288 Kan. at 67. Courts consider the "reasonable expectations of the ordinary user or purchaser," something based on general "consumer expectations" regarding the goods rather than the subjective beliefs of the particular buyer. See *Koken v. Black & Veatch Const., Inc.*, 426 F.3d 39, 52 (1st Cir. 2005). In an often cited case, the New York Court of Appeals stated the fitness of goods for ordinary purposes under the implied UCC warranty depends upon "the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners." *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258-59, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995).

To establish a breach, the buyer must show the ordinary purpose for goods of the type involved in the transaction and the lack of fitness of the goods actually purchased for that purpose. *Hodges*, 288 Kan. at 62. If the goods fall short, they are considered "defective" under the UCC. *Denny*, 87 N.Y.2d at 258-59; see *Miller v. Lee Apparel Co.*, 19 Kan. App. 2d 1015, 1031, 881 P.2d 576 (1994) (coveralls that caught fire not defective or unfit for ordinary purposes as work clothing under K.S.A. 84-2-314 because buyer had no reasonable expectation they would be flame resistant), *rev. denied* 256 Kan. 995 (1994). Dr. Gill contends the veneers, as a matter of law, were not defective in a way that would breach an implied warranty of merchantability.

But a warranty of merchantability entails some expectation of durability, depending on the circumstances of the transaction and the goods involved. Goods satisfy the warranty of merchantability under UCC 2-314 when they do "what they were supposed to do for as long as they were supposed to do it." *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 449 (W.D.N.Y. 2001). Thus, a buyer of a handblown glass vase could not reasonably expect it to survive a fall to a tile floor. But the buyer of the car in *Dale* had a reasonable expectation it would run for some time without the engine, transmission, or other principal mechanical systems quitting. *Dale*, 234 Kan. at 843; see *Glyptal, Inc. v. Engelhard Corp.*, 801 F. Supp. 887, 897 (D. Mass. 1992) (jury question whether durability of exterior paint breached implied warranty of merchantability under UCC 2-314).

Dr. Gill reads too much into the summary judgment record in suggesting the absence of evidence to support a claim for breach of an implied warranty of merchantability. Veneers are uncommon goods, so there is little in the way of tightly analogous case authority on this issue. Veneers do not particularly resemble used cars or computer software. But the broad principles set out in those and other UCC warranty cases can be adapted to this case. And the more refined application of those principles to the specific facts of this case moves from the realm of legal determination appropriate for summary judgment to factfinding reserved for jury trial.

Given the nature of veneers as permanent dental appliances intended to improve the cosmetic appearance of the user's teeth, a jury could rationally conclude a buyer would reasonably expect the veneers to remain in place and hold their appearance for some period of time after the sale. That is, like a late model used car, veneers ought to have some degree of durability when used as intended. Nobody has suggested Golden somehow misused the Cerinate veneers or subjected them to unusual conditions.

Based on her experience in wearing other veneers, Golden has some frame of reference to assess reasonable expectations for the performance of the Cerinate veneers. An expectation so formed from actual experience differs from a purely speculative or subjective belief about veneers or any goods subject to UCC warranties. For example, a regular purchaser of computers for personal or business use has a set of factually based expectations for how a newly purchased unit should perform. That reflects some evidence of the sort of objective consumer expectation implicated in a warranty of merchantability in contrast to an entirely subjective expectation of a first-time user of a tablet. Golden obviously considered the Cerinate veneers to be substandard, and her conclusion appears, in part, to be based on her actual experience with other veneers. Because the scope of the implied warranty of merchantability depends upon the expectations of the objective, reasonable consumer or buyer of veneers and not what Golden personally believed at the time she purchased the Cerinate veneers, her experience with both the veneers she wore earlier and the veneers she bought to replace the Cerinate veneers would be relevant in establishing reasonable consumer expectations.

The weight to be afforded Golden's conclusion would be for the jury, at least as the evidence shapes up in the summary judgment record. We venture no suggestion about the comparative strength of the evidence, since that will depend in no small part on the details of Golden's testimony and the jury's assessment of her credibility. Neither of which we can or should presume to evaluate. We suggest the need for surgical questioning of Golden at trial to differentiate her subjective expectations about the Cerinate veneers in particular from the more experience-based consumer expecta-

tions she had about veneers as a type of goods and the need for similarly precise instructions to the jury about the relevance of such testimony.

Other summary judgment evidence supports the breach of an implied warranty of merchantability, suggesting the Cerinate veneers performed below what might be reasonably expected of veneers generally. If credited by the jury, Golden's testimony that Dr. Gill told her porcelain dental products would not discolor or stain reflects some measure of what would be reasonably expected. In other words, if used as intended, porcelain dental appliances ought to retain their general color or appearance. As a practitioner in the field, Dr. Gill reasonably could be viewed as knowledgeable about standard characteristics of those sorts of goods.

Courts sometimes point out that warranties of merchantability apply to the fundamental functions or core attributes of the goods rather than matters of aesthetics or appearance. See, *e.g.*, *Carey v. Chaparral Boats, Inc.*, 514 F. Supp. 2d 1152, 1156 (D. Minn. 2007) (cracking of a boat's finish amounts to a "cosmetic problem" that "in no way affects" the boat's ordinary use and, therefore, does not breach an implied warranty of merchantability); *Testo v. Russ Dunmire Oldsmobile*, 16 Wash. App. 39, 44-45, 554 P.2d 349 (1976); see *Dale*, 234 Kan. at 843 (low-mileage used car breaches warranty of merchantability if "major component," such as engine or transmission, fails shortly after sale). Those cases would be factually inapposite here given the ordinary use of dental veneers. The veneers are, by their very purpose, cosmetic. If certain veneers fail of that purpose in a manner atypical of that product generally, they likely would not meet standards of merchantability under the UCC.

Dr. Gill also argues the veneers were not covered by and, in any event, conformed to any implied warranty of fitness for a particular purpose under K.S.A. 84-2-315. When a seller "has reason to know [of] any particular purpose for which the goods are required" and should understand that the buyer "is relying on the seller's skill or judgment to select or furnish suitable goods," the transaction includes "an implied warranty that the goods shall be fit for such purpose." K.S.A. 84-2-315. Unlike an implied warranty of merchantability, an implied warranty of fitness for a particular purpose

depends upon communication between the buyer and seller regarding a specific transaction. A warranty for particular purpose is narrower, based on a tailored use of the specific goods known to the seller rather than on an ordinary characteristic or suitability common to goods of that general type. See *Smith v. Stewart*, 233 Kan. 904, 907-08, 667 P.2d 358 (1983); *Chase v. Kawasaki Motors Corp., U.S.A.*, 140 F. Supp. 2d 1280, 1289 (M.D. Ala. 2001) (citing 1 White & Summers, Uniform Commercial Code § 9-10 [4th ed. 1995]). For example, an implied warranty of fitness for a particular use arises if the buyer of shoes informs the seller he or she intends to go mountain climbing and elicits the seller's help in selecting appropriate footwear. See *Smith*, 233 Kan. at 907-08 (citing that example from the Official UCC Comment as illustrative of an implied warranty of fitness for particular purpose).

As we have noted, whether the parties engaged in communication or otherwise created an implied warranty of fitness for a particular purpose in a given transaction typically presents a jury question. *Circle Land & Cattle Corp. v. Amoco Oil Co.*, 232 Kan. 482, 486, 657 P.2d 532 (1983). The buyer "need not bring home" or emphasize to the seller the particular purpose intended for the goods or the reliance on the seller's skill in choosing among goods to meet that purpose, so long as the seller reasonably should understand the buyer's special use and reliance. 232 Kan. at 486. The buyer, however, must actually rely on the seller's input. 232 Kan. at 486.

A jury could conclude that Golden relied on Dr. Gill to keep her from purchasing goods that would fail to meet her expressed desire for exceptionally white teeth, a particular purpose or use. See *Lohmann & Rauscher, Inc. v. YKK (U.S.A.) Inc.*, 477 F. Supp. 2d 1147, 1155 (2007) (jury question whether commercial buyer relied on commercial seller's expertise in selecting goods suitable for a particular purpose when it requested welded straps for use in orthopedic braces). While Golden had identified the Cerinate veneers as the product she believed would best fit her needs, she had not already contracted to purchase them when she met with Dr. Gill. According to Golden, they discussed her desire for very white teeth. Dr. Gill recalled suggesting Golden might prefer a

more natural shade for the veneers, since the whitest ones might look artificial. Golden, nonetheless, asked Dr. Gill to order the brightest veneers Den-Mat made.

The evidence would support a jury determination that Golden had a particular purpose in mind beyond simply some cosmetic improvement in the appearance of her teeth. She wanted strikingly white teeth, even if some people, apparently including Dr. Gill, might find them unnatural and unflattering. On its face, that looks to be a particular purpose in contrast to a generic characteristic of veneers. Dr. Gill certainly knew of that purpose and knew of Golden's plan to buy Cerinate veneers. In turn, Golden's request of Dr. Gill for some assurance that the veneers would satisfy that purpose and Dr. Gill's purported response that porcelain dental appliances do not discolor or stain could be construed as creating an implied warranty of fitness for a particular purpose. Golden made clear a specific need she wanted the veneers to satisfy and sought affirmation from Dr. Gill the Cerinate veneers would work. The communication may not have been pointed, detailed, or extended. But, as the *Circle Land & Cattle Corp.* case recognizes, the circumstances giving rise to the warranty may be fairly casual. The jury should be permitted to make the call on whether there was an implied warranty of fitness for a particular purpose under K.S.A. 84-2-315 and whether the veneers breached that warranty.

Breaches of implied warranties of merchantability and of fitness for a particular purpose are not mutually exclusive. *Lohmann & Rauscher*, 477 F. Supp. 2d at 1154 (construing Kansas version of UCC). That is, depending on the facts, a seller may be liable for breaching both in a single transaction, although a buyer may not recover duplicative damages. For example, a pair of shoes sold to a person requesting footwear for mountain climbing may have a claim for a breach of warranty for a particular purpose if they fall apart halfway up Denali. If the sole on one of them starts flapping while the person walks through KCI airport to get on a flight to Alaska, the shoes likely breach an implied warranty of merchantability for footwear generally and necessarily breach the more specific and more demanding warranty for the particular purpose of mountain climbing. Here, the claims for breach are more closely

connected. The asserted warranty of merchantability related to durability, including resistance to chipping, retention in place, and constancy of color and appearance. The warranty of fitness for a particular purpose appears to depend on constancy of color and appearance alone. That overlap, however, does not impose a legal bar to either claim. The jury, properly instructed, ought to determine the existence and scope of the warranties and any concomitant breach.

## Application of KCPA

The district court ruled that some of Golden's claims under the KCPA failed as a matter of law on substantive grounds apart from any statute of limitations bar. Both Den-Mat and Dr. Gill also argue those claims fail on substantive grounds on which the district court did not rely. Because the district court erred in entering summary judgment on statute of limitations grounds, we must address those alternative bases that arguably support the ruling for Den-Mat and Dr. Gill. We now turn to that task and of necessity outline the general scope of the KCPA.

The KCPA applies to both goods and services. K.S.A. 50-624(h) ("property" subject to the Act includes "goods"); K.S.A. 50-624(i) (services defined for coverage under the Act). The Act regulates the conduct of "suppliers," a term including sellers and manufacturers. K.S.A. 50-624(j). Under K.S.A. 50-626(a), a supplier may not engage in deceptive acts or practices in connection with a consumer transaction. The statute provides a nonexclusive list of types of conduct constituting deceptive acts or practices, including representations made knowingly or with reason to know that property or services have "characteristics" they, in fact, do not. K.S.A. 50-626(b)(1)(A).

Under K.S.A. 50-627, a supplier may not engage in unconscionable acts or practices. Broadly viewed, unconscionability reflects a gross disparity in the value of a transaction favoring the supplier resulting, at least in part, from unequal bargaining power or knowledge, often tied to the buyer's physical or mental infirmity, illiteracy, or lack of fluency in the language used to make the sale. See K.S.A. 50-627(b)(1), (2). One of the enumerated unconscionable

acts entails the exclusion or modification of implied warranties or remedies for their breach, except as otherwise provided in K.S.A. 50-639. K.S.A. 50-627(b)(7).

In turn, K.S.A. 50-639 pertains to consumer transactions involving property and precludes any modification or dilution of implied warranties of merchantability or of fitness for a particular use under the UCC, as adopted in K.S.A. 84-2-314 and K.S.A. 84-2-315. Any such impairment of the warranties cannot be enforced. K.S.A. 60-639(e). If a supplier has attempted to dilute those warranties and a consumer proves a breach of warranty, he or she may recover attorney fees and a civil penalty in addition to actual damages. K.S.A. 50-639(e). The statute also eliminates any requirement that suppliers be in direct privity with consumer-buyers to be bound by the implied UCC warranties. K.S.A. 50-639(b). Some property and some transactions have been excluded from the provisions of K.S.A. 50-639. Those exclusions are not pertinent here. Basically, K.S.A. 50-639 creates a free-standing KCPA violation when a supplier attempts to limit either a UCC warranty of merchantability or a UCC warranty of fitness for a particular purpose and then breaches the warranty in connection with a consumer transaction involving property.

Apart from the statute of limitations issues under the KCPA, the district court held that Dr. Gill could not be liable because she provided services rather than goods to Golden. The premise appears to be doubly incorrect. As with the UCC issues, Dr. Gill rendered services that were inextricably related to and made necessary only because of Golden's purchase of the veneers. Those services included consultation with Golden and, on the facts presented, discussion about the characteristics of porcelain dental appliances. Based on the services alone, a jury could find a deceptive act or practice under K.S.A. 50-626. In addition, however, Dr. Gill was directly involved in the sale of the veneers, since she ordered them, took delivery of them, and received the payment for them. Those circumstances present a jury question whether Dr. Gill engaged in a deceptive act or practice based on the goods alone. The combination of Dr. Gill's involvement in the sale of the veneers

and the provision of the related services only fortifies the conclusion that a jury question has been presented.

Dr. Gill points to a snippet of Golden's deposition testimony in which she acknowledges she does not have "any allegation that [Dr. Gill] was trying to deceive [me] in any way" as an alternative basis to grant summary judgment on the deceptive act or practices claim. But the argument stretches the testimony too far. Golden appears to be conceding only that she has no personal knowledge of Dr. Gill's intention or state of mind. Summary judgment is not typically proper merely because a given witness has no firsthand evidence on a point. For a violation of K.S.A. 50-626(b), the supplier need only have "reason to know" that a representation about characteristics or qualities of the goods or services is inaccurate or misleading. Golden's testimony simply does not speak to what Dr. Gill ought to have known about the veneers, especially as a professional involved in their sale and physical application. In the absence of more pointed evidence, Dr. Gill has not met the substantial burden for entitlement to summary judgment on the argument she advances.

The district court also held that Dr. Gill could not be liable for limiting any implied warranties because the warranty card she presented to Golden did not impose limitations. The card purported to provide a 5-year limited warranty superseding "all other warranties, whether expressed or implied." Given that language, an interpretation of the warranty card as anything other than a modification or elimination of the implied UCC warranties is untenable. See *Stair v. Gaylord*, 232 Kan. 765, 776, 659 P.2d 178 (1983). In *Stair*, the Kansas Supreme Court rejected the very argument the district court appears to posit. In that case, the court held that an express warranty purporting to exclude any implied warranties violated K.S.A. 50-639 because such language "obviously" marked "an attempt[ ] to limit implied warranties imposed by K.S.A. 84-2-314 and -315." 232 Kan. at 776. The district court in *Stair*, therefore, committed reversible error in finding no violation of K.S.A. 50-639 as a matter of law. The Kansas Supreme Court reiterated the point in *Dale*, 234 Kan. at 843, holding that a seller may offer a limited express warranty but that warranty "cannot limit the im-

plied warranties of merchantability" and of fitness for ordinary purposes. Here, the district court failed to explain the reasoning behind its conclusion, failed to show just how the warranty card ought to be viewed as something other than a limitation of implied warranties in violation of K.S.A. 50-639, and failed to suggest why *Stair* and *Dale* did not control. The district court erred in ruling the card did not run afoul of K.S.A. 50-639.

Dr. Gill argues that her involvement with the warranty card itself was limited to handing the document to Golden so she can't be held to the contents. But that mischaracterizes the evidence. Dr. Gill signed the warranty card and was directly involved in the sales transaction to which it applied. Dr. Gill also points to Golden's testimony as a basis for summary judgment on the limitation of warranties. Again, the evidence misses the mark. A violation of K.S.A. 50-639 requires no misleading or deceptive actions—only a dilution of implied warranties. So Golden's view one or way or the other on any effort by Dr. Gill to mislead her would be legally irrelevant. Whether Dr. Gill should be accountable under K.S.A. 50-639 for the improper limitations contained in the warranty card must be left for the jury.

Dr. Gill has another path of escape, as we have noted. If the jury were to find that services predominated over goods in the contract, the UCC would not apply, and, as a result, no implied warranties would arise under the UCC. Absent any UCC warranties, K.S.A. 50-639 does not pertain to the transaction. So if a jury were to find the contract to be outside the scope of the UCC, Golden's claim under K.S.A. 50-639 would necessarily fail.

Den-Mat argues that K.S.A. 50-639 does not apply because Golden's UCC warranty claims were untimely and, thus, barred. To obtain a remedy under K.S.A. 50-639, a consumer-buyer must prevail on an implied warranty claim and show the supplier's wrongful limitation of the warranty. K.S.A. 50-639(e). A properly lodged defense to the warranty claim would preclude relief under the KCPA. But we have found jury questions prevent summary judgment on the implied warranty claims on statute of limitations grounds. Accordingly, Den-Mat's argument to jettison Golden's claim under K.S.A. 50-639 similarly fails.

Finally, Golden has argued that the dilution of the implied UCC warranties also amounts to an unconscionable act or practice in violation of K.S.A. 50-627. In this respect—and this respect only—the district court correctly granted summary judgment to Den-Mat and Dr. Gill. A supplier's attempt to limit implied warranties may be an unconscionable act or practice other than in those circumstances covered in K.S.A. 50-539 dealing with UCC warranties. Because Golden relies on UCC warranties, she presents a claim under K.S.A. 50-639 and does so with sufficient evidentiary support to require the claim be submitted to a jury. By the same token, however, Golden then necessarily comes within the provision in K.S.A. 50-627 excepting claims based on limitations of the UCC warranties. See K.S.A. 50-627(b)(7) (unconscionable act or practice to limit warranties "except as provided by K.S.A. 50-639"). Golden does not argue the implied warranties in this case derive from some legal source other than the UCC. Golden, therefore, has no claim for a separate violation of K.S.A. 50-627.

The plain language of K.S.A. 50-627(b)(7), containing the exclusion for implied UCC warranties, requires that result. The wording is clear and unmistakable. The courts, therefore, must give meaning to the legislative choice set out in the statute. See *Hall v. Dillon Companies, Inc.*, 286 Kan. 777, 785, 189 P.3d 508 (2008). Second, the provisions of K.S.A. 50-639 dealing with UCC warranties reflect a specific or narrow statute in contrast to the more general terms used in K.S.A. 50-627(b)(7) addressing limitations of warranties generally. The common canons of construction require that a specific statute control over the more general, suggesting that any limitation of implied UCC warranties in a consumer transaction be adjudicated under K.S.A. 50-639 rather than under K.S.A. 50-627. See *In re K.M.H.*, 285 Kan. 53, 82, 169 P.3d 1025 (2007), *cert. denied* 555 U.S. 937 (2008); *cf. Bulova Watch Co. v. United States*, 365 U.S. 753, 758, 81 S. Ct. 864, 6 L. Ed. 2d 72 (1961).

Here, taking the evidence in the best light for Golden and given her description of her claim, we conclude she has neither presented nor supported an unconscionable act or practice under K.S.A. 50-627. Because the relevant facts are undisputed and unconscionability under the KCPA presents a question of law, this

court may properly decide the point in reviewing a grant of summary judgment. K.S.A. 50-627(b) (the unconscionability of an act or practice presents "a question for the court"); see *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009).

We conclude, as a matter of law, the legislature intended consumers to pursue claims for dilution of implied UCC warranties of merchantability and of fitness for a particular purpose through K.S.A. 50-639 exclusively and not as proscribed unconscionable acts or practices. Golden's claim for a violation of K.S.A. 50-627 fails as a matter of law. The district court is affirmed on that point.

## APPLICATION OF KPLA

Dr. Gill argues that Golden's claims against her under both the UCC and the KCPA are subsumed or preempted by the Kansas Product Liability Act (KPLA), K.S.A. 60-3301 *et seq.* Dr. Gill suggests the KPLA, therefore, provides an alternative ground for summary judgment. The argument is misguided, since Dr. Gill has not shown the KPLA applies to her.

We need not engage in a detailed analysis of the substantive provisions of the KPLA. In short, the KPLA imposes certain limits on the liability of manufacturers and sellers resulting from defects in design or construction of products or deficiencies in instructions for use, packaging, or advertising. K.S.A. 60-3302(c) (defining product liability claim); K.S.A. 60-3306 (outlining limitations on liability of product seller). In addressing Dr. Gill's argument, we focus on whether she is among the persons and entities covered under the KPLA rather than on the protections extended to them.

The KPLA covers both "product sellers" and "manufacturers," while distinctly defining them. K.S.A. 60-3302(a), (b). A manufacturer "designs, produces, makes, fabricates, constructs, or remanufactures the relevant product." K.S.A. 60-3302(b). Dr. Gill would not be a manufacturer of the veneers, and the definition does not include an installer or similar language that would more aptly describe her role. A product seller is a person or entity "in the business of selling products, whether the sale is for resale, or for use or consumption." K.S.A. 60-3302(a). But the definition of product

seller expressly excludes "a health care provider . . . who utilizes a product in the course of rendering professional services." K.S.A. 60-3302(a). Dr. Gill agrees she afforded Golden professional services, and the veneers were inextricably tied to those services. Dr. Gill, therefore, would be unable to invoke the KPLA in this case if she were an excluded health care provider. Certain dentists licensed to administer local or general anesthetics are among the excluded health care providers. K.S.A. 60-3302(a) (incorporating by reference those providers identified in K.S.A. 2011 Supp. 40-3401[f]; some dentists included as health care providers).

As the proponent of the KPLA as a defense, Dr. Gill has an obligation to come forward with evidence on summary judgment that would allow a jury to find those facts necessary to show the Act applies to her in this case. In other words, Dr. Gill must point to record evidence reasonably supporting the argument she is a product seller within the meaning of the KPLA, since coverage of the Act would amount to an avoidance on which she bears the burden of proof at trial. See *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006) (if defendant bears ultimate burden of persuasion on issue, defendant must come forward with facts on summary judgment that would allow a jury finding in its favor); *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997) (When advancing an affirmative defense on summary judgment, a defendant has the burden to establish a factual basis for the defense.); see also *Hartman v. Stumbo*, 195 Kan. 634, 638-39, 408 P.2d 693 (1965) (noting federal authority to be instructive on summary judgment under Kansas Code of Civil Procedure and recognizing that summary judgment could be granted on statute of limitations where defendant offered plaintiff's deposition testimony and other evidence demonstrating untimeliness of action).

On appeal, Dr. Gill has identified no evidence of that type and relies solely on the bare assertion the KPLA applies to her. In particular, Dr. Gill has failed to provide facts showing she is not among the health care providers excluded from the KPLA. We, therefore, reject her assertion that the KPLA provides as an alternative ground supporting summary judgment in her favor.

We secondarily come to that conclusion because the KPLA does not apply to claims for "direct or consequential economic loss." K.S.A. 60-3302(c) (product liability claim entails "harm"); K.S.A. 60-3302(d) ("harm . . . does not include direct or consequential economic loss"). Golden has represented that she has abandoned or intends to abandon any request for pain and suffering or allied noneconomic damages. If she adheres to that representation and promptly withdraws her demand for those damages following remand to the district court, the only damages remaining would entail economic loss outside the scope of the KPLA.

## CONCLUSION

The judgment for Den-Mat and Dr. Gill is reversed, except as to Golden's claim based on an unconscionable act or practice violating K.S.A. 50-627(b)(7), and remanded for further proceedings, including trial. Golden may proceed with her claims for breach of express warranty, for breach of implied warranty of merchantability under K.S.A. 84-2-314, for breach of implied warranty of fitness for a particular purpose under K.S.A. 84-2-315, for deceptive acts and practices under K.S.A. 50-626, and for improper limitation of implied warranties under K.S.A. 50-639.

Affirmed in part, reversed in part, and remanded with directions.